Matthew G. Monforton  (Montana Bar # 5245)
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone:  (406) 570-2949
E-mail:       matthewmonforton@yahoo.com

Attorney for Plaintiff Daria Danley

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| DARIA DANLEY, ) | |
| ) | Case No. _____ |
| Plaintiff, ) | |
| v. ) | **VERIFIED COMPLAINT** |
| ) | |
| CLAYTON CHRISTIAN, Commissioner of ) | |
| Higher Education, WADED CRUZADO, ) | |
| President of Montana State University, ) | |
| KYLEEN BRESLIN, Director of Montana ) | |
| State University's Office of Institutional ) | |
| Equity, ) | |
| ) | |
| Defendants. ) | |
| ) | |

COMES NOW Plaintiff Daria Danley, who alleges the following:

## I. INTRODUCTION

1. This case involves a sorority member at Montana State University-Bozeman (MSU) who has been stalked and victimized by a fellow sorority member.

2.     The victim reported the harassment to the leadership of the sorority chapter.  She also questioned the sorority's insistence that members include "preferred pronouns" when identifying themselves.

3.     The sorority chapter characterized the victim's statements as "hate speech" and reported her to MSU officials.

4.     MSU officials responded by punishing the victim for her "hate speech."  They imposed an "interim" no-contact order against her in September 2021 that barred her from attending any of the sorority's events or entering any campus building in which her harasser was present.

5.     A month later, MSU officials filed a sham administrative complaint charging the victim with committing "discrimination" and "discriminating harassment" against her harasser.

6.     The victim's sorority also punished her -- at MSU's suggestion -- resulting in her being evicted from the sorority house.

7.     In February 2022, MSU dismissed its sham administrative complaint. The victim then successfully applied to the sorority's national headquarters for reinstatement.

8.     But MSU continues to maintain its "interim" no-contact order against the victim despite dismissing the administrative complaint against her a year ago.

9.      MSU has rejected repeated requests by the victim to rescind the order and has never explained why the order remains necessary or elaborated on why it was imposed in the first place.  Nor has MSU ever given the victim a hearing to challenge the order.

10.     The "interim" no-contact order is preventing the victim from associating with her sorority, thereby violating her constitutional and statutory rights.  Without relief from this Court, the order will become a black mark on her university record that will undermine her future educational and professional prospects.

11.     MSU's vindictiveness toward student criticism of the LGBTQ community is not new.  In 2017, another MSU student filed suit in this Court after MSU suspended him for protected speech made during a private meeting with an MSU professor that was critical of a transgender student.  *Erik Powell v. Montana State University, et al*. (D. Mont. Case No. CV 17-15-BU-SEH).

12.     In settling the *Powell* lawsuit, MSU was required to expunge the plaintiff's record of disciplinary marks and pay him.

13.     Nevertheless, MSU is continuing its discriminatory policy of punishing students whose speech is deemed offensive to LGBTQ students.

## II. JURISDICTION AND VENUE

14.    This Court has subject-matter jurisdiction under 28 U.S.C. §§1331, 1343, 1367, and 42 U.S.C. § 1983, and the First and Fourteenth Amendments to the United States Constitution.

15.    Venue is proper in the Helena Division of the District of Montana. L.R. 3.2(b).

## PARTIES

16.    Plaintiff Daria Danley is a full-time student enrolled at Montana State University-Bozeman (MSU) in Gallatin County, Montana.

17.    Plaintiff Danley is informed and believes, and upon such information and belief alleges, that Defendant Clayton Christian is a resident of Lewis & Clark County, Montana.

18.    Plaintiff Danley is informed and believes, and upon such information and belief alleges, that Defendant Waded Cruzado is a resident of Gallatin County, Montana.

19.    Plaintiff Danley is informed and believes, and upon such information and belief alleges, that Defendant Kyleen Breslin is a resident of Gallatin County, Montana.

20.    Defendants are sued in both their official and personal capacity.

## FACTUAL ALLEGATIONS

### Defendants' Policy of Discrimination Against Students Whose Speech is Deemed Offensive to LGBTQ Students

21.     The governance and administration of the Montana University System, including MSU, is vested in the Board of Regents.

22.     The Board of Regents requires MSU and other campuses to insure that no employment or educational policy is discriminatory on the basis of race, color, religion, creed, political ideas, sex, gender identity, sexual orientation, age, marital status, physical or mental disability, national origin, or ancestry unless based on reasonable grounds.

23.     Defendant Christian is, and at all times pertinent to this action has been, Montana's Commissioner of Higher Education.

24.     As the Commissioner of Higher Education, Defendant Christian has a duty to execute, administer, and assure the implementation of the policies, decisions, and rules of the Board of Regents, including the Board's non-discrimination policy.

25.     Defendant Cruzado is, and at all times pertinent to this action has been, the President of MSU.

26.     As the President of MSU, Defendant Cruzado is its chief executive officer and is vested with the responsibility of administering Board policies under the supervision and control of Defendant Christian.

27.     Defendant Breslin is, and at all times pertinent to this action has been, the Director of MSU's Office of Institutional Equity.

28.     As the Director of MSU's Office of Institutional Equity, Defendant Breslin implements and enforces the University's "Discrimination, Harassment, and Retaliation Policy," a copy of which can be found at

www.montana.edu/equity/policies/index.html

29.     Defendant Breslin acts under the direction of Defendant Cruzado.

30.     MSU implemented its Discrimination, Harassment, and Retaliation Policy in 2019.

31.     Along with its official Discrimination, Harassment, and Retaliation Policy, MSU has an unwritten policy of punishing students whose speech is deemed offensive to LGBTQ students.

32.     For example, Erik Powell, a former MSU student, expressed his objections regarding transgenderism during a private meeting with one of his professors in 2016.

33.     The director of MSU's Office of Institutional Equity responded by issuing a no-contact order as well as a criminal trespass warning resulting in Powell's removal from campus.

34.    While investigating Powell, the director of MSU's Office of Institutional Equity sent an email to the transgender "victim" informing him that the director was an "aspiring ally" of the LGBTQ community.

35.    Powell's protected speech resulted in his suspension from MSU.

36.    Defendant Christian upheld Powell's illegal suspension.

37.    Powell responded by filing suit in this Court in 2017. *Erik Powell v. Montana State University, et al*. (D. Mont. Case No. CV 17-15-BU-SEH).

38.    Powell's lawsuit resulted in MSU agreeing to pay Powell $120,000 and expunging his record of any disciplinary action.

39.    Both Defendant Christian and Defendant Cruzado know of MSU's policy of punishing students for speech deemed offensive to LGBTQ students.

40.    But Defendant Christian and Defendant Cruzado have given MSU's Office of Institutional Equity unbridled discretion to issue no-contact orders, including "interim" no-contact orders of unlimited duration, to enforce MSU's policy of punishing speech deemed offensive to LGBTQ students

41.    Defendants need not give notice or a hearing to a student before issuing a no-contact order against him or her.

42.    Defendants do not require a showing of a risk of future violations before issuing a no-contact order.

## **Alpha Gamma Delta's Expressive Activities**

43.     Alpha Gamma Delta (AGD) is a sorority founded in 1904 in Syracuse,

New York.  AGD now has about 200 chapters at colleges and universities

throughout the nation.

44.     Each AGD member pledges to do the following:

- To gain understanding that wisdom may be vouchsafed to me.
- To develop and prize health and vigor of body.
- To cultivate acquaintance with many whom I meet.
- To cherish friendships with but a chosen few and to study the perfecting of those friendships.
- To welcome the opportunity of contributing to the world's work in the community where I am placed because of the joy of service thereby bestowed and the talent of leadership multiplied.
- To honor my home, my country, my religious faith.
- To hold truth inviolable, sincerity essential, kindness invaluable.
- To covet beauty in environment, manner, word and thought.
- To possess high ideals and to attain somewhat unto them.

45.     AGD provides opportunities for personal development, service to

others, and the space for members to forge their own paths—all through a lifelong

spirit of sisterhood.

46.     AGD's activities are guided by its motto: "Inspire the Woman. Impact

the World."

47.     One way that AGD inculcates its values in its members is by

providing workshops, seminars, and other educational opportunities that focus on

topics such as leadership development, philanthropy, and personal growth.

48.     Another way AGD inculcates its values in its members is through the use of a formal pledge program in which prospective members are taught by members and advisors to uphold the sorority's values and, if they are selected for membership, are held accountable by AGD leaders and fellow members.

49.     AGD encourages its members to assume leadership roles within the organization and in the members' communities by, *inter alia*, leading chapter meetings, representing AGD at various functions, and organizing charity and community service events.

50.     By taking on these responsibilities, AGD members develop leadership skills and practice the values of AGD in real-world settings.

51.     AGD members who hold leadership positions develop leadership skills through hands-on experience and guidance from other members and advisors.

52.     AGD also offers leadership retreats and conferences that allow members to learn from experts and further develop their leadership skills in a collaborative environment.

53.     These events include sessions on topics such as teamwork, public speaking, and problem-solving.

54.     AGD promotes academic excellence by providing study groups and tutoring for its members.

55.     AGD members include both members of active college chapters and alumnae members.

56.     AGD's Junior Circle Program provides young alumnae members additional opportunities for further sisterhood and networking with fellow members.

## Plaintiff Danley's Association with Alpha Gamma Delta

57.     Plaintiff Daria Danley has been enrolled as a full-time student at MSU since August 2020.

58.     During the fall of 2020, Plaintiff Danley began the process of becoming a member of the AGD chapter at MSU.

59.     This included upper-class members of AGD instructing her and other prospective members on AGD's values and purposes.

60.     Plaintiff Danley successfully completed this process, resulting in her being initiated as a member of AGD in November 2020.

61.     Plaintiff Danley was soon elected as the chapter's Vice President of Campus Relations.

62.     In late May 2021, Plaintiff Danley was appointed as the chapter's Director of Continuous Open Bidding, thereby making her responsible for recruiting new members outside the season when the pledging system typically operates.

63.     Alex Lin was also initiated as a member of the AGD chapter at MSU soon after Plaintiff Danley's initiation.

64.     After being initiated, Lin routinely made inappropriate sexual comments in the presence of other AGD members.

65.     Lin repeatedly told Plaintiff Danley that she wanted to "hang out" with her.

66.     During one weekend, Lin told Plaintiff Danley that she had just broken up with her boyfriend and asked Danley to accompany Lin to her apartment, but Danley declined.

67.     Plaintiff Danley rejected several other requests by Lin to accompany her to her apartment.

68.     Another member of the chapter warned Plaintiff Danley never to be alone with Lin, as that member had observed Lin attempting to take advantage of women when they were intoxicated.

69.     Lin repeatedly ogled Plaintiff Danley during AGD events, making Danley extremely uncomfortable.

70.     Plaintiff Danley informed Molly Rijfkogel, the Vice President of MSU's AGD chapter, of her concerns about Lin's continuous efforts to coax Danley to accompany Lin to her apartment.

71.     Rijfkogel acknowledged Plaintiff Danley's concerns but did not take any corrective action.

72.     During an AGD event held in August 2021, Plaintiff Danley criticized the sorority's use of name tags that included "preferred pronouns."

73.     Sometime in late August or early September 2021, Rijfkogel and other members of AGD's MSU chapter met with Matthew Caires, MSU's Dean of Students concerning Plaintiff Danley.

74.     During that meeting, Dean Caires informed the AGD members that AGD would be poorly perceived if it did not respond to Plaintiff Danley's statements.

75.     On September 4, 2021, Rijfkogel asked Plaintiff Danley to participate in a conference call about concerns AGD's leadership had about Danley.

76.     After the conference call, Rijfkogel sent an email to Plaintiff Danley informing her that she was accused of making comments that "could be defined as hate speech and a hate crime."

77.     A true and correct copy of this email is attached as Exhibit 1.

78.     Plaintiff Danley asked Rijfkogel to identify the alleged "hate speech":

79.     On September 9, 2021, Rijfkogel emailed the following response:

Hello Daria:

Here are what we were given, left vague to respect the privacy of our sisters.

- Statements were made about some of our members' gender, mentioning how it was "stupid" and "dumb" to be in a sorority and to use different pronouns or offer different terms.

- Comments about Alex [Lin] and her sexuality were made, including comments about how she makes you uncomfortable with how she looks at you and others, about her having feelings for you, and how she has tried to take advantage of sisters by getting them drunk.

- Not treating our members as members or as equal [*sic*] because they ask to go by pronouns, terms, or names that you do not agree with.

80.   A true and correct copy of this email is attached as Exhibit 2.

81.   Plaintiff Danley had never repeated the statement told to her by a fellow sorority member that Lin had attempted to take advantage of intoxicated women.

82.   On September 16, 2021, Rijfkogel sent an email to Plaintiff Danley informing her that she had been "dismissed" from the chapter.

83.   A true and correct copy of this email is attached as Exhibit 3.

## **Defendants' Issuance of an "Interim" No-Contact Order Against Plaintiff Danley in Retaliation for Her Protected Speech**

84.   On September 20, 2021, Defendant Breslin emailed Plaintiff Danley a document entitled "Office of Institutional Equity Mutual No Contact Order."

85.     The no-contact order includes language describing it as an "interim measure."

86.     A true and correct copy of this "interim" no-contact order is attached as Exhibit 4.

87.     The "interim" no-contact order prohibits any contact or communication between Plaintiff Danley and Alex Lin and also states that "[i]f either party notices the other upon entering a campus building, the arriving party must leave the location."

88.     The "interim" no-contact order also prohibits Plaintiff Danley (but not Lin) from accessing the chapter's sorority house near MSU.

89.     The "interim" no-contact order also prohibits Plaintiff Danley (but not Lin) from "attending any Alpha Gamma Delta event, regardless of location."

90.     The "interim" no-contact order requires Plaintiff Danley (but not Lin) to contact MSU's Office of Institutional Equity "if you believe Alex Lin has made contact with you or if you have made contact with Alex Lin, even if it was accidental."

91.     The "interim" no-contact order "can be enforced by Montana State University officials and applies to behavior occurring both on and off campus."

92.     The "interim" no-contact order further states that "Reports of violations of this order will be investigated and, if appropriate, may be adjudicated. Violations of this order may result in additional interim measures."

93.     The "interim" no-contact order states that it "will remain in effect until further notice."

94.     Defendants did not contact Plaintiff Danley about the "interim" no-contact order before issuing it.

95.     The "interim" no-contact order does not specify the reason for its issuance.

96.     On October 22, 2021, Defendant Breslin signed an administrative complaint accusing Danley of committing "Discrimination" and "Discriminatory Harassment."

97.     The administrative complaint filed by Breslin was based entirely upon (1) protected speech made by Plaintiff Danley or (2) false accusations made against Plaintiff Danley.

98.     MSU's Office of Institutional Equity subsequently "investigated" Plaintiff Danley and interviewed several AGD members.

99.     Jennifer Wells, an investigator for MSU's Office of Institutional Equity, interviewed Danley for several hours on January 12, 2022.

100.   After the interview, Wells informed Plaintiff Danley that the administrative complaint would be dismissed if Danley agreed to an "informal" resolution that would include "sensitivity" training.

101.   On January 21, 2022, Wells sent an email to Plaintiff Danley to "reach[ ] out to you as we discussed to get an update from you about whether you would be willing to discuss an informal resolution option."

102.   A true and correct copy of the email is attached as Exhibit 5.

103.   Plaintiff Danley declined the offer and refused to submit to Defendants' "sensitivity" training.

104.   On February 3, 2022, Defendant Breslin dismissed the administrative complaint she had filed against Plaintiff Danley in October 2021.

105.   On March 15, 2022, Plaintiff Danley sent an email to Defendant Breslin asking if the interim No-Contact Order was still in place given that the administrative complaint had been dismissed.

106.   Defendant Breslin responded with an email in which she stated that "the no-contact order is an interim measure taken independently of the investigation. It remains in effect."

107.   On March 25, 2022, Plaintiff Danley sent a request to AGD's headquarters in Indiana for reinstatement as an alumna member of the sorority.

108.    In that request, Plaintiff Danley explained that she did not seek to be reinstated as a member of the MSU chapter of AGD given the misconduct committed against her by chapter members.

109.    Rather, Plaintiff Danley sought to become an alumna member of AGD because "I still care greatly for Alpha Gamma Delta as a whole, and I know it does so much good for women, I just happened to get into a bad chapter."

110.    Sometime in the spring of 2022, the AGD chapter at MSU dissolved.

111.    On June 10, 2022, Plaintiff Danley sent an email to Defendant Breslin explaining that Danley had received permission to use AGD's parking lot when she needed to be on campus and inquiring of Breslin as to whether the "interim" no-contact order remained in effect.

112.    Defendant Breslin responded on June 13, 2022, and stated that "the mutual no-contact order will remain in place at this time."

113.    On August 23, 2022, Danley sent an email to Defendant Breslin asking if the "interim" no-contact order was still in place.

114.    Defendant Breslin replied on September 1, 2022, and informed Plaintiff Danley that the "interim" no-contact order would remain in place.

115.    AGD's national headquarters informed Danley on September 21, 2022, that it had approved Danley's application for reinstatement.

116.   Although the AGD chapter at MSU has been dissolved, AGD alumnae members have continued to organize events in and around Bozeman and throughout the nation.

117.   AGD will host several events during the spring semester in Bozeman and around the nation.

118.   These will include events tied to MSU Bobcat basketball and rodeo events as well as graduation-related events later in the spring.

119.   Despite AGD's headquarters restoring her membership, Plaintiff Danley cannot participate in any AGD event due to the "interim" no-contact order's provision prohibiting her from "attending any Alpha Delta Gamma event, regardless of location."

120.   Plaintiff Danley reasonably fears that, if she does attend any AGD event, she will be subject to additional punishment by Defendants.

121.   Plaintiff Danley will continue to be forced to avoid participating in AGD events until this Court enjoins enforcement of Defendants' supposedly "interim" no-contact order.

122.   Defendant Breslin is not the only person who is liable to Plaintiff Danley.

123.   The Board of Regents imposed upon Defendants Christian and Cruzado a duty to insure that none of MSU's employment or educational policies discriminate based on, *inter alia*, political ideas.

124.   Defendants Christian and Cruzado breached this duty by allowing a discriminatory policy at MSU that tolerates offensive speech made by LGBTQ students while punishing similarly situated non-LGBTQ students who engage in protected speech deemed offensive to LGBTQ students, as evidenced by both this case and the *Powell* matter

125.   This breach of duty has contributed to Plaintiff Danley's constitutional and statutory injuries.

**First Cause of Action
First Amendment: Freedom of Speech
(42 U.S.C. § 1983)**

126.   Plaintiff Danley realleges all matters set forth in the preceding paragraphs.

127.   The First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment, prohibits government officials from subjecting citizens to retaliatory actions in response to protected speech.

128.   Expression by university students is protected by the First Amendment.

129.   Public university officials are prohibited by the First Amendment from retaliating against protected expression by students.

130.   Plaintiff Danley's protests against the harassment inflicted upon her by an LGBTQ student as well as her objections to "preferred pronouns" constitute speech protected by the First Amendment.

131.   Defendants issued an "interim" no-contact order against Plaintiff Danley in retaliation for her protected speech.

132.   The "interim" no-contact order prohibits her from "attending any Alpha Gamma Delta event, regardless of location."

133.   The "interim" no-contact order also requires Danley to leave any campus building if she notices that Alex Lin is in the building.

134.   Plaintiff Danley has been forced to self-censor any speech that might be deemed offensive to LGBTQ students because of her fear that Defendants will impose additional sanctions against her.

135.    Without relief from this Court, Plaintiff Danley will be forced to continue self-censoring her speech.

**Second Cause of Action**
**First Amendment: Freedom of Association**
**(42 U.S.C. § 1983)**

136.   Plaintiff Danley realleges all matters set forth in the preceding paragraphs.

137.   The First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment, protects the right to freedom of association.

138.   AGD is an expressive association that engages in expressive activity at MSU and throughout the nation.

139.   Plaintiff Danley is a member in good standing of AGD.

140.   On September 20, 2021, Defendants imposed an "interim" no-contact order prohibiting Plaintiff Danley from "attending any Alpha Gamma Delta event, regardless of location."

141.   Defendants imposed the "interim" no-contact order without providing Plaintiff Danley any notice or opportunity to be heard.

142.   Defendants have never informed Plaintiff Danley of the reason for imposing the "interim" no-contact order.

143.   The "interim" no-contact order is preventing Plaintiff Danley from exercising her First Amendment right to freely associate with AGD.

144.   The "interim" no-contact order remains in effect even though it was imposed over a year ago and Defendants dismissed their bogus administrative complaint against Plaintiff Danley in February 2022 and have no justification for continuing to violate Danley's constitutional rights.

145.   Defendants have ignored multiple requests by Plaintiff to rescind the "interim" no-contact order.

146.   Plaintiff Danley has refrained from attending AGD events out of fear that Defendants will impose additional punishment against her.

147.   Without relief from this Court, Plaintiff Danley will be forced to continue avoiding AGD events.

**Third Cause of Action**
**Fourteenth Amendment: Right to Procedural Due Process**
**(42 U.S.C. § 1983)**

148.   Plaintiff Danley repeats each of the allegations in the preceding paragraphs.

149.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

150.   Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

151.   A person has a protected liberty interest in his or her good name, reputation, honor, and integrity, of which he or she cannot be deprived without due process.

152.   A person also has a protected liberty interest in pursuing his or her education, as well as future educational and employment opportunities and occupational liberty, of which he or she cannot be deprived without due process.

153.   On September 20, 2021, Defendants issued an "interim" no-contact order against Plaintiff Danley.

154.   Defendants imposed the "interim" no-contact order without providing Plaintiff Danley any notice or opportunity to be heard.

155.   Defendants have never informed Plaintiff Danley of the reason for imposing the "interim" no-contact order.

156.   The "interim" no-contact order is preventing Plaintiff Danley from exercising her First Amendment right to freely associate with AGD.

157.   The "interim" no-contact order remains in effect even though it was imposed over a year ago and Defendants dismissed their disciplinary complaint against Plaintiff Danley in February 2022 and have no justification for continuing to violate Danley's constitutional rights.

158.   Defendants have ignored multiple requests by Plaintiff to rescind the "interim" no-contact order.

159.   Without relief from this Court, the "interim" no-contact order will become a black mark upon Plaintiff Danley's student record and diminish her future education and professional opportunities.

**Fourth Cause of Action**
**Montana Constitution, Art. II, §7: Freedom of Speech**

160.   Plaintiff Danley realleges all matters set forth in the preceding paragraphs.

161.   Article II, §7, of the Montana Constitution prohibits government officials from subjecting citizens to retaliatory actions in response to protected speech.

162.   Expression by university students is protected by the Montana Constitution.

163.   Public university officials are prohibited by the Montana Constitution from retaliating against protected expression by students.

164.   Plaintiff Danley's protests against the harassment inflicted upon her by an LGBTQ student as well as her objections to "preferred pronouns" constitute speech protected by the Montana Constitution.

165.   Defendants issued an "interim" no-contact order in retaliation for Plaintiff Danley's protected speech.

166.   The "interim" no-contact order prohibits her from "attending any Alpha Gamma Delta event, regardless of location."

167.   The "interim" no-contact order also requires Danley to leave any campus building if she notices that Lin is in the building.

168.   Plaintiff Danley has been forced to self-censor speech that might be deemed offensive to the LGBTQ community because of her fear that Defendants will impose additional sanctions against her.

169.    Without relief from this Court, Plaintiff Danley will be forced to continue self-censoring her speech.

**Fifth Cause of Action**
**Montana Constitution, Art. II, §7: Freedom of Association**

170.   Plaintiff Danley realleges all matters set forth in the preceding paragraphs.

171.   The Montana Constitution protects the right to freedom of association.

172.   AGD is an expressive association that engages in expressive activity at MSU and throughout the nation.

173.   Plaintiff Danley is a member in good standing of AGD.

174.   On September 20, 2021, Defendants imposed an "interim" no-contact order prohibiting Plaintiff Danley from "attending any Alpha Gamma Delta event, regardless of location."

175.   Defendants imposed the "interim" no-contact order without providing Plaintiff Danley any notice or opportunity to be heard.

176.   Defendants have never informed Plaintiff Danley of the reason for imposing the "interim" no-contact order.

177.   The "interim" no-contact order is preventing Plaintiff Danley from exercising her First Amendment right to freely associate with AGD.

178.   The "interim" no-contact order remains in effect even though it was imposed over a year ago and Defendants dismissed their bogus administrative complaint against Plaintiff Danley in February 2022 and have no justification for continuing to violate Danley's constitutional rights.

179.   Defendants have ignored multiple requests by Plaintiff to rescind the "interim" no-contact order.

180.   Plaintiff Danley has refrained from attending AGD events out of fear that Defendants will impose additional punishment against her.

181.   Without relief from this Court, Plaintiff Danley will be forced to continue avoiding AGD events.

**Sixth Cause of Action**
**Montana Constitution Art. II, § 17: Right to Procedural Due Process**

182.   Plaintiff Danley repeats each of the allegations in the preceding paragraphs.

183.   The Montana Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

184.   The Montana Constitution's due process protections are required in higher education disciplinary proceedings.

185.   A person has a protected liberty interest in his or her good name, reputation, honor, and integrity, of which he or she cannot be deprived without due process.

186.   A person also has a protected liberty interest in pursuing his or her education, as well as future educational and employment opportunities and occupational liberty, of which he or she cannot be deprived without due process.

187.   On September 20, 2021, Defendants issued an "interim" no-contact order against Plaintiff Danley.

188.   Defendants imposed the "interim" no-contact order without providing Plaintiff Danley any notice or opportunity to be heard.

189.   Defendants have never informed Plaintiff Danley of the reason for imposing the "interim" no-contact order.

190.   The "interim" no-contact order is preventing Plaintiff Danley from exercising her First Amendment right to freely associate with AGD.

191.   The "interim" no-contact order remains in effect even though it was imposed over a year ago and Defendants dismissed their disciplinary complaint against Plaintiff Danley in February 2022 and have no justification for continuing to violate Danley's constitutional rights.

192.   Defendants have ignored multiple requests by Plaintiff to rescind the "interim" no-contact order.

193.   Without relief from this Court, the "interim" no-contact order will become a black mark upon Plaintiff Danley's student record and diminish her future education and professional opportunities.

**Seventh Cause of Action**
**Montana Expressive Activity on Campuses Act**
**(Mont. Code Ann. § 20-25-1501, *et seq.*)**

194.   Plaintiff Danley realleges all matters set forth in the preceding paragraphs.

195.   The Montana Expressive Activity on Campuses Act, Mont. Code Ann. § 20-25-1501, *et seq.,* grants students the right to engage in expressive activity on campus.

196.   Defendants have violated the Montana Expressive Activity on Campuses Act by imposing the "interim" No-Contact Order against Plaintiff Danley in response to Danley's expressive activity.

197.   The Board of Regents imposed a duty upon Defendant Christian and Defendant Cruzado to ensure that MSU lacks any policy discriminating against students based on their political ideas or gender identity.

198.   Both Defendant Christian and Defendant Cruzado know of MSU's policy of punishing non-LGBTQ students for speech deemed to be offensive to LGBTQ students but have done nothing to prevent its enforcement.

199.   Instead, Defendant Christian and Defendant Cruzado have given MSU's Office of Institutional Equity unbridled discretion to issue no-contact orders, including "interim" no-contact orders of unlimited duration, thereby enabling enforcement of MSU's discriminatory policy against non-LGBTQ students.

200.   By breaching their duty to eliminate MSU's policy of discrimination against non-LGBTQ students, Defendant Christian and Defendant Cruzado are liable for the resulting violation of Plaintiff Danley's rights under the Montana Expressive Activity on Campuses Act.

201.   Without relief from this Court, Plaintiff Danley will be forced to continue avoiding AGD events.

## PRAYER FOR RELIEF

Plaintiff Daria Danley respectfully requests the following relief from this Court concerning all of her causes of action:

- A judgment declaring that Defendants' Interim No-Contact Order violates Plaintiff Danley's rights under the First Amendment and Fourteenth Amendment;

- A preliminary and permanent injunction ordering Defendants to (1) stop enforcing the Interim No-Contact Order; and (2) remove any reference to the Interim No-Contact Order, the complaint filed by Defendant Breslin on October 22, 2021, investigation related to the Interim No-Contact Order and complaint contained in MSU's records for Plaintiff Danley;

- An award of reasonable attorneys' fees and costs;

- Any other relief to which Plaintiff Danley may be entitled.

Regarding her Fourth, Fifth, Sixth, and Seventh Causes of Action, Plaintiff Daria Danley also respectfully requests an award of compensatory damages and punitive damages, including for the reputational harm and emotional harm and distress Defendants have caused Plaintiff Danley.

DATED: January 8, 2023

/s/ Matthew G. Monforton
Matthew Monforton
Attorney for Plaintiff Daria Danley

**DEMAND FOR TRIAL BY JURY**

Plaintiff Danley demands a trial by jury for all issues so triable.

DATED: January 8, 2023

/s/ Matthew Monforton
Matthew Monforton
Attorney for Plaintiff Daria Danley

## VERIFICATION BY DARIA DANLEY

I, Daria Danley, declare as follows:

    1. I am the Plaintiff in this matter.

    2. I have reviewed the attached Complaint and declare that the facts and allegations contained therein are true, except so far as they are stated to be on information, and that, so far as they are stated to be on information, I believe them to be true.

    I declare under penalty of perjury under the laws of the United States of America that the statements contained in this Verification are true and correct.

Executed on January _8_, 2023, in Bozeman, Montana.


Daria Danley