Matthew G. Monforton  (Montana Bar # 5245)
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone:  (406) 570-2949
E-mail:      matthewmonforton@yahoo.com

Attorney for Plaintiff Daria Danley

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| DARIA DANLEY, <br><br>        Plaintiff, <br><br>   v. <br><br> CLAYTON CHRISTIAN, Commissioner of Higher Education, WADED CRUZADO, President of Montana State University, KYLEEN BRESLIN, Director of Montana State University's Office of Institutional Equity, <br><br>        Defendants. | Case No. CV 23-4-H-SEH <br><br> **BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... v

INTRODUCTION ................................................................................ 1

STATEMENT OF FACTS ..................................................................... 2

ARGUMENT ....................................................................................... 10

I.  DEFENDANTS' "INTERIM" NO-CONTACT ORDER VIOLATES
    DANLEY'S FIRST AMENDMENT RIGHT TO ASSOCIATE WITH
    ALPHA GAMMA DELTA  ........................................................... 10

    A. Alpha Gamma Delta is an Expressive Organization................................. 10

    B. The "Interim" No-Contact Order is Preventing Danley's
       Participation in AGD Events ..................................................... 15

    C. The State Has No Compelling Interest in Prohibiting Danley
       From Attending Alpha Gamma Delta Events ........................................... 16

    D. The "Interim" No-Contact Order is not Narrowly Tailored ..................... 17

II. THE "INTERIM" NO-CONTACT ORDER IS AN UNLAWFUL
    PRIOR RESTRAINT ................................................................... 19

III. DANLEY SATISFIES THE *WINTER* REQUIREMENTS FOR A
     PRELIMINARY INJUNCTION....................................................... 24

IV. NO BOND SHOULD BE REQUIRED BECAUSE DEFENDANTS
    WILL SUFFER NO HARM IF THE COURT ENJOINS THEIR
    UNCONSTITUTIONAL CONDUCT ............................................... 26

CONCLUSION..................................................................................... 28

EXHIBITS

Exhibit 1  ................................Email from AGD V.P. to Danley dated Sept. 4, 2021
Exhibit 2  ................................Email from AGD V.P. to Danley dated Sept. 9, 2021
Exhibit 3  .............................Email from AGD V.P. to Danley dated Sept. 16, 2021
Exhibit 4  .................................... "Interim" No-Contact Order dated Sept. 20, 2021
Exhibit 5  ............................ Email from Investigator to Danley dated Jan. 21, 2022

# <u>TABLE OF AUTHORITIES</u>

<u>CASES:</u>

*Alexander v. United States*,
    509 U.S. 544 (1993)................................................................................ 19, 21-22

*Alpha Delta Chi-Delta Chapter v. Reed*,
    648 F.3d 790 (9th Cir. 2011)........................................................... 12

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)......................................................... 24

*Berger v. City of Seattle*,
    569 F.3d 1029 (9th Cir. 2009).......................................................... 19

*Bible Club v. Placentia-Yorba Linda Sch. Dist.*,
    573 F.Supp. 1291 (C.D. Cal 2008) .................................................. 27

*Boy Scouts of America v. Dale*,
    530 U.S. 640 (2000)............................................... 10, 11, 12, 16, 17

*City of Lakewood v. Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988).................................................................... 21, 22

*Clark v. City of Lakewood*,
    259 F.3d 996 (9th Cir. 2001).......................................................... 19

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999)....................................................................... 16

*Elrod v. Burns*,
    427 U.S. 347, 373-74 (1976)......................................................... 25

*Flores v. Bennett,*
    2022 WL 9459604 (E.D. Cal. Oct 14, 2022) ................................. 27

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990).................................................................. 19, 20

*Green v. Miss United States of America, LLC,*
    52 F.4th 773 (9th Cir. 2022) ........................................................ 11

*In re Dan Farr Productions,*
    874 F.3d 590 (9th Cir. 2017) ........................................................ 21

*In re National Security Letter,*
    33 F.4th 1058 (9th Cir. 2022) ................................................. 20, 21

*Iota Xi Chapter of Sigma Chi Fraternity v. Patterson,*
    538 F.Supp.2d 915 (E.D. Va. 2008) ............................................ 12

*Jacobs v. Clark County School Dist.,*
    526 F.3d 419 (9th Cir. 2008) ................................................... 11-12

*Joelner v. Washington Park,*
    378 F.3d 613 (7th Cir. 2004) ....................................................... 26

*Johnson v. Couturier,*
    572 F.3d 1067 (9th Cir. 2009) ................................................. 26-28

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) ....................................................... 27

*Levine v. U.S. Dist. Ct.,*
    764 F.2d 590 (9th Cir. 1985) ....................................................... 21

*Monterey Mechanical Co v. Wilson,*
    125 F.3d 702 (9th Cir. 1997) ....................................................... 25

*NAACP v. State of Alabama ex rel. Patterson,*
    357 U.S. 449 (1958) .................................................................... 10

*Perlot v. Green,*
    2022 WL 2355532 (D. Idaho June 30, 2022) .............................. 19

*Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh,*
    229 F.3d 435 (3d Cir. 2000) ......................................................... 11

*Riley v. National Federal of the Blind of N.C.*,
    487 U.S. 781 (1988) ........................................................................ 20

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ............................................................. 10, 16, 17

*Rodriguez v. Maricopa County Community College Dist.*,
    605 F.3d 703 (9th Cir. 2010) ......................................................... 16

*Sanders County Rep. Cent. Comm. v. Bullock*,
    698 F.3d 741 (9th Cir. 2012) ......................................................... 26

*Sigma Lambda Upsilon/Senoritas Latinas Unidas Sorority, Inc. v.*
*Rector & Visitors of Univ. of Va.*,
    503 F.Supp.3d 433 (W.D. Va. 2020) ....................................... 12-13

*Spirit of Aloha Temple v County of Maui*,
    49 F.4th 1180 (9th Cir. 2022) ....................................................... 19

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ....................................................... 25

*Thalheimer v. City of San Diego*,
    645 F.3d 1109 (9th Cir. 2011) ....................................................... 26

*United Food and Commercial Worker Local 99 v. Brewer*,
    817 F.Supp.2d 1118 (D. Ariz. 2011) ............................................. 27

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002) ........................................................................ 20

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................... 24

RULES:

Fed. R. Civ. P. 65(c) ........................................................................ 26-27

## INTRODUCTION

In 2021, a sorority member enrolled at Montana State University-Bozeman (MSU) began sexually harassing another member of the sorority.  The victim reported the harassment to the sorority's leadership, and also protested the sorority's insistence on using "preferred pronouns."

The sorority's leaders conveyed these statements to MSU's Dean of Students.  The Dean told them that the sorority would look bad if it failed to take action *against the victim*.  Days later, the sorority expelled the victim because of her "hate speech."

Days after that, MSU piled on by issuing an "interim" no-contact order prohibiting the victim from attending any of the sorority's events or communicating in any manner with the victim's harasser.  MSU followed up a month later by filing an administrative complaint against the victim for engaging in "discrimination" and "discriminatory harassment."  MSU subjected the victim to a four-month investigation before dismissing its sham complaint against her in February 2022.  The victim then successfully applied to the sorority's national headquarters for reinstatement as a member.

A year later, MSU is still enforcing its "interim" no-contact order despite numerous requests by the victim to rescind it.  The order constitutes an ongoing

violation of her First Amendment right to associate with her sorority and is also an

unlawful prior restraint.  Immediate relief from this Court is therefore warranted.

## STATEMENT OF FACTS

### Alpha Gamma Delta's Expressive Activities

Alpha Gamma Delta (AGD) is a sorority founded in 1904 in Syracuse, New

York, and now has about 200 chapters at colleges and universities throughout the

nation.  Verif. Comp. ¶ 43.  Each AGD member pledges to do the following:

- To gain understanding that wisdom may be vouchsafed to me.
- To develop and prize health and vigor of body.
- To cultivate acquaintance with many whom I meet.
- To cherish friendships with but a chosen few and to study the perfecting of those friendships.
- To welcome the opportunity of contributing to the world's work in the community where I am placed because of the joy of service thereby bestowed and the talent of leadership multiplied.
- To honor my home, my country, my religious faith.
- To hold truth inviolable, sincerity essential, kindness invaluable.
- To covet beauty in environment, manner, word and thought.
- To possess high ideals and to attain somewhat unto them.

Verif. Comp. ¶ 44.

AGD provides opportunities for personal development, service to others, and

the space for members to forge their own paths—all through a lifelong spirit of

sisterhood.  Verif. Comp. ¶ 45.  Its activities are guided by its motto: "Inspire the

Woman. Impact the World."  Verif. Comp. ¶ 46.

One way that AGD inculcates its values in its members is by providing workshops, seminars, and other educational opportunities that focus on topics such as leadership development, philanthropy, and personal growth.  Verif. Comp. ¶ 47. Another way AGD inculcates its values is through the use of a formal pledge program in which prospective members are taught by members and advisors to uphold the sorority's values and, if they are selected for membership, held accountable by AGD leaders and fellow members. Verif. Comp. ¶ 48.

AGD encourages members to assume leadership roles within the organization and in the members' communities by, *inter alia*, leading chapter meetings, representing AGD at various functions, and organizing charity and community service events.  Verif. Comp. ¶ 49.  By taking on these responsibilities, AGD members develop leadership skills and practice the values of AGD in real-world settings.  Verif. Comp. ¶ 50.  AGD members who hold leadership positions develop leadership skills through hands-on experience and guidance from other members and advisors.  Verif. Comp. ¶ 51.  AGD also offers leadership retreats and conferences that allow members to learn from experts and further develop their leadership skills in a collaborative environment.  Verif. Comp. ¶ 52.  These events include sessions on topics such as teamwork, public speaking, and problem-solving.  Verif. Comp. ¶ 53.  AGD promotes academic excellence by providing study groups and tutoring for its members.  Verif. Comp. ¶ 54.  AGD members

3

include both members of active college chapters and alumnae members.  Verif. Comp. ¶ 56.

## Plaintiff Danley's Association with Alpha Gamma Delta

Plaintiff Daria Danley has been enrolled as a full-time student at MSU since August 2020.  Verif. Comp. ¶ 57.  During the fall of 2020, Danley began the process of becoming a member of the AGD chapter at MSU.  Verif. Comp. ¶ 58. This included upper-class members of AGD instructing her and other prospective members on AGD's values and purposes.  Verif. Comp. ¶ 59.  Danley completed this process, resulting in her being initiated as a member of AGD in November 2020.  Verif. Comp. ¶ 60.  She was soon elected as the chapter's Vice President of Campus Relations and later appointed as the chapter's Director of Continuous Open Bidding, thereby making her responsible for recruiting new members outside the season when the pledging system typically operates.  Verif. Comp. ¶¶ 61-62.

Alex Lin was also initiated as a member of the AGD chapter at MSU soon after Danley's initiation.  Verif. Comp. ¶ 63.  After being initiated, Lin routinely made inappropriate sexual comments in the presence of other AGD members and repeatedly told Danley that she wanted to "hang out" with her.  Verif. Comp. ¶¶ 64-65.  During one weekend, Lin told Danley that she had just broken up with her boyfriend and asked Danley to accompany Lin to her apartment, but Danley

4

declined.  Verif. Comp. ¶ 66.  Danley rejected several other similar requests by Lin.  Verif. Comp. ¶ 67.  Another member of the chapter warned Danley never to be alone with Lin, as that member had observed Lin trying to take advantage of women when they were intoxicated.  Verif. Comp. ¶ 68.  Lin repeatedly ogled Danley during AGD events, making Danley extremely uncomfortable.  Verif. Comp. ¶ 69.

Danley informed Molly Rijfkogel, the Vice President of MSU's AGD chapter, of her concerns about Lin's continuous efforts to coax Danley to accompany Lin to her apartment.  Verif. Comp. ¶ 70.  Rijfkogel acknowledged Danley's concerns but did not take any corrective action.  Verif. Comp. ¶ 71.

During an AGD event held in August 2021, Danley criticized the sorority's use of name tags that included "preferred pronouns."  Verif. Comp. ¶ 72. Sometime in late August or early September 2021, Rijfkogel and other members of AGD's MSU chapter met with Matthew Caires, MSU's Dean of Students concerning Danley.  Verif. Comp. ¶ 73.  During that meeting, Dean Caires informed the members that AGD would be poorly perceived if it did not respond to Danley's statements.  Verif. Comp. ¶ 74.

On September 4, 2021, Rijfkogel asked Danley to participate in a conference with AGD's chapter leadership.  Verif. Comp. ¶ 75.  After the conference call, Rijfkogel sent an email to Danley informing her that she was accused of making

comments that "could be defined as hate speech and a hate crime."  Verif. Comp. ¶ 76; *id.*, Exhibit 1.[1] Danley asked Rijfkogel to identify the alleged "hate speech." Verif. Comp. ¶ 78.  Rijfkogel responded with the following email:

> Hello Daria:
>
> Here are what we were given, left vague to respect the privacy of our sisters.
>
> • Statements were made about some of our members' gender, mentioning how it was "stupid" and "dumb" to be in a sorority and to use different pronouns or offer different terms.
>
> • Comments about Alex [Lin] and her sexuality were made, including comments about how she makes you uncomfortable with how she looks at you and others, about her having feelings for you, and how she has tried to take advantage of sisters by getting them drunk.
>
> • Not treating our members as members or as equal [*sic*] because they ask to go by pronouns, terms, or names that you do not agree with.

Verif. Comp. ¶ 79; *id.*, Exhibit 2.  Danley had never repeated the statement told to her by a fellow sorority member that Lin had attempted to take advantage of intoxicated women.  Verif. Comp. ¶ 81.  On September 16, 2021, Rijfkogel sent an email to Plaintiff Danley informing her that she had been "dismissed" from the chapter.  Verif. Comp. ¶ 82; *id.*, Exhibit 3.

---

[1] For the Court's convenience, copies of the exhibits attached to the Verified Complaint are also attached to this brief.

## **Defendants' Issuance of an "Interim" No-Contact Order Against**
## **Plaintiff Danley in Retaliation for Her Protected Speech**

On September 20, 2021, Defendant Kyleen Breslin, the director of MSU's

Office of Institutional Equity," emailed Plaintiff Danley a document entitled

"Office of Institutional Equity Mutual No Contact Order."  Verif. Comp. ¶ 84; *id.*,

Exhibit 4.  The no-contact order includes language describing it as an "interim

measure."  Verif. Comp. ¶ 85.  It prohibits any contact or communication between

Plaintiff Danley and Alex Lin and also states that "[i]f either party notices the other

upon entering a campus building, the arriving party must leave the location."

Verif. Comp. ¶ 87.  The order also:

- Prohibits Danley (but not Lin) from accessing the chapter's sorority house near MSU.
- Prohibits Danley (but not Lin) from "attending any Alpha Gamma Delta event, regardless of location."
- Requires Danley (but not Lin) to contact MSU's Office of Institutional Equity "if you believe Alex Lin has made contact with you or if you have made contact with Alex Lin, even if it was accidental."

Verif. Comp. ¶¶ 88-90.

The no-contact order "can be enforced by Montana State University officials

and applies to behavior occurring both on and off campus."  Verif. Comp. ¶ 91.  It

further states that "Reports of violations of this order will be investigated and, if

appropriate, may be adjudicated. Violations of this order may result in additional

interim measures."  Verif. Comp. ¶ 92.  The order "will remain in effect until

further notice." Verif. Comp. ¶ 93. Defendants did not contact Danley about the "interim" no-contact order before issuing it and they have never given her a reason for its issuance. Verif. Comp. ¶¶ 94-95.

On October 22, 2021, Defendant Breslin signed an administrative complaint accusing Danley of committing "Discrimination" and "Discriminatory Harassment." Verif. Comp. ¶ 96. The administrative complaint filed by Breslin was based entirely upon (1) protected speech made by Plaintiff Danley or (2) false accusations made against Plaintiff Danley. Verif. Comp. ¶ 97.

MSU's Office of Institutional Equity subsequently investigated Danley and interviewed several AGD members. Verif. Comp. ¶ 98. Jennifer Wells, an investigator for MSU's Office of Institutional Equity, interviewed Danley for several hours on January 12, 2022. Verif. Comp. ¶ 99. After the interview, Wells informed Danley that the administrative complaint would be dismissed if Danley agreed to an "informal" resolution that would include "sensitivity" training. Verif. Comp. ¶ 100. Wells sent Danley an email a week later to "reach[ ] out to you as we discussed to get an update from you about whether you would be willing to discuss an informal resolution option." Verif. Comp. ¶ 101; *id.*, Exhibit 5. Danley declined. Verif. Comp. ¶ 103. Defendant Breslin dismissed the administrative complaint on February 2, 2022. Verif. Comp. ¶ 104.

In March, June, and August 2022, Danley emailed Defendant Breslin to request the rescission of the no-contact order.  Verif. Comp. ¶¶ 105, 111, 113. Each time, Breslin refused. Verif. Comp. ¶¶ 106, 112, 114.

Danley sent a request to AGD's headquarters in Indiana for reinstatement as an alumna member of the sorority in March 2022.  Verif. Comp. ¶ 107.  She explained that she did not seek to be reinstated as a member of the MSU chapter of AGD given the misconduct committed against her by chapter members. Verif. Comp. ¶ 108.  Danley told AGD that, instead, she sought to become an alumna member of AGD because "I still care greatly for Alpha Gamma Delta as a whole, and I know it does so much good for women, I just happened to get into a bad chapter."  Verif. Comp. ¶ 109.  AGD's national headquarters approved Danley's reinstatement request on September 21, 2022.  Verif. Comp. ¶ 115.

Although the AGD chapter at MSU has been dissolved, AGD alumnae members have continued to organize events in and around Bozeman and throughout the nation.  Verif. Comp. ¶ 116.  AGD will host several events during the spring semester in Bozeman and around the nation.  Verif. Comp. ¶ 117.  These will include events tied to MSU Bobcat basketball and rodeo events as well as graduation-related events later in the spring.  Verif. Comp. ¶ 118.

Despite AGD's headquarters restoring her membership, Danley cannot participate in any AGD event due to the "interim" no-contact order's provision

prohibiting her from "attending any Alpha Delta Gamma event, regardless of

location." Verif. Comp. ¶ 119.  Danley reasonably fears that, if she does attend any

AGD event, she will be subject to additional punishment by Defendants.  Verif.

Comp. ¶ 120.  Danley will continue to be forced to avoid participating in AGD

events until this Court enjoins enforcement of Defendants' "interim" no-contact

order.  Verif. Comp. ¶ 121.

## ARGUMENT

I.  DEFENDANTS' "INTERIM" NO-CONTACT ORDER VIOLATES
    DANLEY'S FIRST AMENDMENT RIGHT TO ASSOCIATE WITH
    ALPHA GAMMA DELTA

   A. <u>Alpha Gamma Delta is an Expressive Organization</u>

        Defendants' no-contact order is violating Danley's First Amendment rights

by obstructing her association with AGD, an expressive organization.  The First

Amendment protects "the right to associate with others in pursuit of a wide variety

of political, social, economic, educational, religious, and cultural ends." *Roberts v.*

*U.S. Jaycees*, 468 U.S. 609, 622 (1984); *NAACP v. State of Alabama ex rel.*

*Patterson,* 357 U.S. 449, 460–61 (1958). ("It is beyond debate that freedom to

engage in association for the advancement of beliefs and ideas is an inseparable

aspect of the . . . freedom of speech.").  Invoking this right requires a showing that

the group at issue is an "expressive association." *Boy Scouts of America v. Dale*,

530 U.S. 640, 648 (2000).  But, "[t]his standard is not demanding, as the

'expressive association' designation extends well beyond 'advocacy groups' to include any group that engages in some form of expression whether it be public or private." *Green v. Miss United States of America, LLC*, 52 F.4th 773 (9th Cir. 2022) (VanDyke, J., concurring) (slip. opn. at 2), quoting *Dale*, 530 U.S. at 648. This is because "[t]he Supreme Court has cast a fairly wide net in its definition of what comprises expressive activity." *Id.,* slip. opn. at 2 (VanDyke, J., concurring), quoting *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 443 (3d Cir. 2000).  Under the Ninth Circuit's "lenient standard," for example, the Miss USA pageant, which "consist[s] of speeches, costumes, and elaborate ceremonies in furtherance of its ideal vision of femininity certainly qualifies." *Id.* slip. opn. at 3.)

The facts in *Dale* provide a close analogy to those in this case.  In holding that the Boy Scouts was an expressive association, the Supreme Court noted that the Scouts sought to instill the values found in the Scout Oath and Law:

> Scout Oath
>
> On my honor I will do my best
> To do my duty to God and my country
> and to obey the Scout Law;
> To help other people at all times;
> To keep myself physically strong,
> mentally awake, and morally straight.

Scout Law

A Scout is:
Trustworthy Obedient "Loyal Cheerful
Helpful Thrifty
Friendly Brave "Courteous Clean
Kind Reverent."

*Dale*, 530 U.S. at 49.  The court also noted that "[d]uring the time spent with the youth members, the scoutmasters and assistant scoutmasters inculcate them with Boy Scouts' values – both expressly and by example."  *Id.* at 649-50.  The court then held that "[i]t seems indisputable that an association that seeks to transmit such a system of values engages in expressive activity."  *Id.* at 650.

It likewise seems indisputable that a sorority such as Alpha Gamma Delta, which seeks to transmit similar values, engages in expressive activity. *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 538 F.Supp.2d 915, 923 (E.D. Va. 2008) (holding that "a college fraternity is no different from the Boy Scouts" and thus "protected by the First Amendment's expressive associational right."). Indeed, defendants in similar cases rarely even contest the issue.  See, *e.g.*, *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 797 n.2 (9th Cir. 2011) ("San Diego State does not dispute that Alpha Delta Chi and Alpha Gamma Omega engage in expression..."); *Sigma Lambda Upsilon/Senoritas Latinas Unidas Sorority, Inc. v. Rector & Visitors of Univ. of Va.*, 503 F.Supp.3d 433, 444 n.5

(W.D. Va. 2020) ("the moving defendants do not dispute that SLU engages in expressive association for purposes of the First Amendment.").

Like the Boy Scouts, AGD seeks to instill its values in its members. Each AGD member pledges to do the following:

- To gain understanding that wisdom may be vouchsafed to me.
- To develop and prize health and vigor of body.
- To cultivate acquaintance with many whom I meet.
- To cherish friendships with but a chosen few and to study the perfecting of those friendships.
- To welcome the opportunity of contributing to the world's work in the community where I am placed because of the joy of service thereby bestowed and the talent of leadership multiplied.
- To honor my home, my country, my religious faith.
- To hold truth inviolable, sincerity essential, kindness invaluable.
- To covet beauty in environment, manner, word and thought.
- To possess high ideals and to attain somewhat unto them.

Verif. Comp. ¶ 44. AGD inculcates these values into its members in several ways. AGD promotes academic excellence by providing study groups and tutoring for its members. Verif. Comp. ¶ 54. It provides workshops, seminars, and other educational opportunities that focus on topics such as leadership development, philanthropy, and personal growth. Verif. Comp. ¶ 47. AGD also uses a formal pledge program in which prospective members are taught by members and advisors to uphold the sorority's values and, if they are selected for membership, are held accountable by AGD leaders and fellow members. Verif. Comp. ¶ 48.

AGD also encourages its members to assume leadership roles within the organization and in the members' communities by, *inter alia*, leading chapter meetings, representing AGD at various functions, and organizing community service and charity events.  Verif. Comp. ¶ 49.  By taking on these responsibilities, AGD members develop leadership skills and practice the values of AGD in real-world settings.   Verif. Comp. ¶ 50.  AGD members who hold leadership positions develop leadership skills through hands-on experience and guidance from other members and advisors.  Verif. Comp. ¶ 51.   AGD also offers leadership retreats and conferences that allow members to learn from experts and further develop their leadership skills in a collaborative environment.  Verif. Comp. ¶ 52.  These events include sessions on topics such as teamwork, public speaking, and problem-solving.  Verif. Comp. ¶ 53.

AGD has a deeply ingrained set of values and has been inculcating those values in its members for over a century through its pledge system and the continuous events, community outreach, leadership opportunities, and training that it provides its members.  Verif. Comp. ¶ 54.  AGD is clearly an expressive organization entitled to First Amendment protection.

B. The "Interim" No-Contact Order is Preventing Danley's
    Participation in AGD Events

Defendants' "interim" no-contact order is prohibiting Danley from

"attending any Alpha Gamma Delta event, regardless of location" and applies both

on and off campus.  Exhibit 4.  Danley is barred from attending *any* AGD event

anywhere in the nation – not just formal AGD events and not just in-person AGD

events.  She therefore cannot join online events or even something that could be

considered an informal event.  And because an "event" can be just about anything,[2]

the order effectively shuts Danley off from any kind of contact with AGD

members.

The no-contact order has no durational limits.  Although Defendants have

labeled it an "interim measure," Exhibit 4, the order remains in force nearly a year

after Defendants dismissed their sham administrative complaint in February 2022.

Because Danley has no idea when (if ever) Defendants will withdraw the "interim"

no-contact order, she cannot plan to attend any AGD event in the future.

Defendants' outrageous conduct has resulted in Danley being entirely cut off from

AGD.

---

[2] See <https://www.merriam-webster.com/dictionary/event>, defining "event"
as "something that happens," "a noteworthy happening," or "a social occasion or
activity."

C.  The State Has No Compelling Interest in Prohibiting Danley
     From Attending Alpha Gamma Delta Events

Defendants' "interim" no-contact order is severely burdening Danley's

constitutional right of association with AGD.  Such an order can survive only if it

was "adopted to serve compelling state interests, unrelated to the suppression of

ideas, that cannot be achieved through means significantly less restrictive of

associational freedoms."  *Dale*, 530 U.S. at 648, quoting *Roberts*, 468 U.S. at 623.

Defendants have no compelling interest in punishing Danley for her

protected speech.  Defendants may try to rely on general interests in combatting

harassment or acts of discrimination.  But Danley's protests against Lin's

harassment and AGD's use of preferred pronouns come nowhere near that

exceptionally high bar.  See *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of*

*Educ*., 526 U.S. 629, 633 (1999) (to be actionable harassment must be "so severe,

pervasive, and objectively offensive that it effectively bars the victim's access to

an educational opportunity or benefit.").  What's more, "[t]here is no categorical

'harassment exception' to the First Amendment's free speech clause."  *Rodriguez*

*v. Maricopa County Community College Dist*., 605 F.3d 703, 708 (9th Cir. 2010).

"Harassment law generally targets conduct" and it can "sweep[ ] in speech . . . only

when consistent with the First Amendment."  *Id.* at 710.  Anti-harassment

measures cannot target "pure speech."  *Id.*

16

Defendants have not provided any evidence of wrongdoing by Danley other than accusations that she made statements deemed offensive to LGBTQ students. This might explain why they dismissed their sham complaint against Danley after investigating her for several months.  Verif. Comp. ¶ 104.

Any argument that MSU has a compelling interest in barring Danley from associating with AGD is especially weak given that the no-contact order targets Danley's association with a *private* organization rather than MSU itself.  Just because Lin happens to be a member of AGD does not give Defendants any more right to obstruct Danley's relationship with that organization than MSU would have if she and Lin had the same off-campus employer, or were members of the same church.

### D. The "Interim" No-Contact Order is not Narrowly Tailored

Defendants must also show that their interests (such as they are) "cannot be achieved through means significantly less restrictive of associational freedoms." *Dale*, 530 U.S. at 648, quoting *Roberts*, 468 U.S. at 623.  They cannot do so. Indeed, it is difficult to overstate the breadth of Defendants' "interim" no-contact order.

First, it is anything but "interim."  An "interim order" is "a temporary court decree that takes effect until something else occurs."  Black's Law Dictionary (8th

ed. 2004).  Defendants issued the order in September 2021, filed an administrative complaint against Danley in October 2021, then dismissed the complaint in February 2022.  Verif. Comp. ¶¶ 84, 96, 104.  After an entire year, and after three fruitless requests by Danley to Defendant Breslin, the "interim" order remains in force.  Exhibit 4.  The order does not identify what factors Defendants will consider as to whether to lift the order – or even if Defendants will ever lift the order.  Exhibit 4.  Nor is there any MSU procedure or rule that Danley can invoke to require any meaningful review of the order.  All she can do is keep asking Defendant Breslin to rescind the order.  Defendant Breslin has unbridled discretion to continue maintaining the interim no-contact, and she has not given any indication as to when, if ever, she will rescind it.

Second, the interim no-contact order has no geographic boundaries.  It applies "both on and off campus."  Exhibit 4.  It bars Plaintiff Danley from saying anything to Alex Lin, whether flattering or unflattering, fact or opinion, innocuous or significant, and regardless of the medium of communication, even though both are AGD members.  And, as a practical matter, it bars nearly all communication between Danley and AGD.  She is barred from "attending any Alpha Gamma Delta event, regardless of location."  Exhibit 4.  The term "event" is exceptionally broad. Danley is therefore at risk of additional sanctions if she makes almost any attempt to communicate with fellow AGD members.

18

II.  THE "INTERIM" NO-CONTACT ORDER IS AN UNLAWFUL
     PRIOR RESTRAINT

Defendants' interim no-contact order should also be enjoined because it

"makes the peaceful enjoyment of freedoms which the Constitution guarantees

contingent upon the uncontrolled will of an official—as by requiring a permit or

license which may be granted or withheld in the discretion of such official," and is

therefore "an unconstitutional censorship or prior restraint."  *Spirit of Aloha*

*Temple v County of Maui,* 49 F.4th 1180, 1191 (9th Cir. 2022).  "Prior restraints"

are "administrative and judicial orders forbidding certain communications when

issued in advance of the time that such communications are to occur."  *Alexander*

*v. United States*, 509 U.S. 544, 550 (1993).  A hallmark of a prior restraint is that

"the enjoyment of protected expression is contingent upon the approval of

government officials."  *Clark v. City of Lakewood*, 259 F.3d 996, 1005 (9th Cir.

2001), citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223-24 (1990).

University no-contact orders arising from protected speech that grant university

officials unbridled discretion to punish protected speech constitute prior restraints.

*Perlot v. Green*, 2022 WL 2355532, *12 n. 31 (D. Idaho June 30, 2022).

Prior restraints "are the most serious and least tolerable infringement on First

Amendment rights" and therefore "bear a heavy presumption against their

constitutionality." *Berger v. City of Seattle*, 569 F.3d 1029, 1059 (9th Cir. 2009);

see also Alexander Bickel, *The Morality of Consent,* 61 (1975) ("where a criminal

statute chills, prior restraint freezes."). That is because "[i]t is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–66 (2002).

State actors who impose prior restraints must meet both substantive and procedural safeguards before implementing them. Procedurally, "any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained." *In re National Security Letter*, 33 F.4th 1058, 1071 (9th Cir. 2022) (citations omitted). An indefinite prior restraint does not pass constitutional muster because "[w]here the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion." *FW/PBS,* 493 U.S. at 225. Courts have repeatedly struck down laws giving government officials unlimited time in which to suppress protected speech. *Id.* at 227 (ordinance requiring chief of police to issue licenses to adult businesses within 30 days of receiving license application was struck because ordinance also required approval from fire and health departments, which could be withheld indefinitely); *Riley v. National Federal of the Blind of N.C.*, 487 U.S. 781, 802 (1988) (state law requiring solicitors for charities to obtain license did not impose any deadline upon officials for issuing

licenses and was therefore unconstitutional); *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 771 (1988) (city ordinance was a prior restraint because it allowed applications for permits to install newsracks on city property to "languish indefinitely").

The First Amendment also requires that, when issuing a prior restraint, the "censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *In re National Security Letter*, 33 F.4th at 1071.  In a case involving protected speech, such as this one, that burden is substantial, because the government must satisfy the demanding requirements of strict scrutiny.  *In re Dan Farr Productions*, 874 F.3d 590, 593 n.2 (9th Cir. 2017).  The government must establish that the prior restraint is narrowly tailored to serve a compelling government interest.  *Levine v. U.S. Dist. Ct.*, 764 F.2d 590, 595 (9th Cir. 1985).  "[A]ny imposition of a prior restraint must be based on case-specific justifications for why less extreme measures are not viable alternatives." *Dan Farr Productions*, 874 F.3d at 596.

The "interim" no-contact order in this case is a prior restraint.  It was issued by Defendant Breslin, the director of MSU's Office of Institutional Equity.  Verif. Comp. ¶ 84.  The order prevents her from communicating in any way with Alex Lin, a fellow AGD member, and also prohibits most interactions between Danley and AGD.  Exhibit 4.  It is therefore an "administrative…order[ ] forbidding

21

certain communications when issued in advance of the time that such communications are to occur." *Alexander*, 509 U.S. at 550.

Defendants ignored the First Amendment's procedural and substantive protections when they imposed the no-contact order in September 2021 in response to Danley's protected speech. Defendants' policies allow them to issue no-contact orders without the burden to seek any review of their censorship. The order has been "languishing indefinitely," *Plain Dealer,* 486 U.S. at 771, despite Defendants dismissing their sham complaint against Danley back in February 2022. The only "appeal" of the "interim" no-contact order goes to the very same officer that issued the order. And despite numerous requests by Danley, Defendants have refused to withdraw the order or give any indication as to when (or if) they will do so in the future. Verif. Comp. ¶¶ 106, 112, 114.

As stated previously, Defendants have no compelling interest in maintaining the order against Danley. Indeed, there was no justification to issue it at all. Defendants issued the no-contact order in September 2021 based upon Plaintiff Danley's protected speech. And after filing administrative charges against her in October 2021, they dismissed them in February 2022. They have no interest in censoring Danley's interactions with AGD or Alex Lin.

Nor can the no-contact order possibly be deemed to be narrowly tailored. As stated previously, it is anything but "interim." Defendants issued the order in

September 2021, filed an administrative complaint against Danley in October 2021, then dismissed the complaint in February 2022.  Verif. Comp. ¶¶ 84, 96, 104.  After an entire year, and after three fruitless requests by Danley to Defendant Breslin, the "interim" order remains in force.  Exhibit 4.  The order does not identify what factors Defendants will consider when to lift the order, or even if Defendants will ever lift the order.  Exhibit 4.  Nor is there any MSU procedure or rule that Plaintiff Danley can invoke to require any meaningful review of the order.  All she can do is keep asking Defendant Breslin to rescind the order.  Defendant Breslin has unbridled discretion to continue maintaining the interim no-contact, and she has not given any indication as to when, if ever, she will rescind it.

Moreover, the interim no-contact order has no geographic boundaries.  It applies "both on and off campus."  Even if Defendants had a compelling interest in imposing their "interim" no-contact order, and maintaining it for a year after dismissing their administrative complaint, the order could not in any way be deemed to be the least restrictive means by which to achieve that interest.  The order is therefore an unconstitutional prior restraint and should be enjoined by this Court.

III   DANLEY SATISFIES THE *WINTER* REQUIREMENTS FOR A
PRELIMINARY INJUNCTION

To obtain injunctive relief, a plaintiff must show (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if injunctive relief is not granted, (3) the balance of equities tips in his or her favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As shown below, Danley can satisfy each of these requirements.

A   <u>Danley is Likely to Succeed on the Merits</u>

Danley has previously shown that the "interim" no-contact order violates her First Amendment right to associate with AGD and is also an unlawful prior restraint.[3]   She is therefore likely to succeed on the merits.

At the very least, Danley has satisfied the alternate "sliding scale" approach applied by the Ninth Circuit to preliminary injunction motions. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this rule, Danley is entitled to injunctive relief because she has raised "serious questions going to the merits" along with showing (as described below) that the balance of the hardships tips sharply in her favor and that the other two *Winter* factors favor him. *Id.* at 1135.

---

[3] See pp. 10-23 *supra*.

B.  Danley Will Suffer Irreparable Harm if Relief is not Granted

Ongoing or future constitutional violations by a defendant satisfy the irreparable harm requirement because "unlike monetary injuries, constitutional violations cannot be adequately remedied through damages." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009); *Monterey Mechanical Co v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("an alleged constitutional infringement will often alone constitute irreparable harm").  Moreover, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976).

As stated previously, the "interim" no-contact order is violating Danley's First Amendment rights.[4]  This deprivation will continue until this Court grants relief, relief that cannot be achieved with monetary damages.  This factor thus weighs in favor of granting injunctive relief.

C  The Balance of Equities Tips Sharply in Danley's Favor

The balance of hardships tips sharply in Danley's favor.  Every day that goes by is a day in which her constitutional right to freedom of association and speech is being infringed by Defendants' no-contact order.  If Danley is denied injunctive

---

[4] See pages 10-23, *supra*.

relief, her First Amendment rights will continue being violated.  On the other hand, there is no detriment to the State from enjoining an unconstitutional act.  *Sanders County Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 749 (9th Cir. 2012).  This factor sharply tips in Danley's favor.

### D. Enjoining the No-Contact Order is in the Public Interest

First Amendment rights are ones that, if protected, will unquestionably advance the public interest.  *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1129 (9th Cir. 2011) ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."); *Joelner v. Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("it is always in the public interest to protect First Amendment liberties").  This factor, therefore, favors granting injunctive relief as well.

## III. NO BOND SHOULD BE REQUIRED BECAUSE DEFENDANTS WILL SUFFER NO HARM IF THE COURT ENJOINS THEIR UNCONSTITUTIONAL CONDUCT

A party is normally required to post a bond as a condition for issuance of a preliminary injunction.  Fed. R. Civ. P. 65(c).  Though the text of Rule 65(c) suggests that an injunction bond is necessary in all cases, the Ninth Circuit has held that the rule "invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Courturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)

(emphasis added).  A court may waive the bond requirement in Rule 65(c) "when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Courts routinely grant injunctive relief in First Amendment cases without requiring bonds because enjoining government censorship rarely, if ever, results in harm. See, *e.g. Flores v. Bennett,* 2022 WL 9459604, *17 (E.D. Cal. Oct 14, 2022) (no bond required in case involving college students' First Amendment challenge to college's restriction on posting flyers); *United Food and Commercial Worker Local 99 v. Brewer*, 817 F.Supp.2d 1118, 1128 (D. Ariz. 2011) (no bond required by the court because "[t]here is no realistic likelihood that Defendants will be harmed by being enjoined from enforcing a law that constitutes viewpoint discrimination in violation of the First Amendment on its face."); *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F.Supp. 1291, 1302 n.6 (C.D. Cal 2008) ("[g]iven that this case involves the probable violation of the Bible Club's First Amendment rights, and that the damages to the District of issuing this injunction seem minimal, if they exist at all, the Bible Club need not post a bond.")

Danley requests that this Court enjoin the "interim" no-contact order. This would enable her to associate with AGD and communicate with Lin should she also be at an AGD event.  It would also obviate the need for Danley to avoid entering a campus building whenever Lin is present in the same building,

something the no-contact order has required Danley to do for over a year.  Exhibit

4.  Defendants cannot possibly suffer harm resulting from such injunctive relief.

Therefore, Danley respectfully requests that she be granted relief without the

necessity of posting a bond.

## **<u>CONCLUSION</u>**

For all of the foregoing reasons, Plaintiff Daria Danley respectfully requests

that this Court grant her motion for a preliminary injunction and enjoin Defendants

from enforcing the no-contact order they issued against her in September 2021.


DATED: January 19, 2023          Respectfully submitted,

                                 <u>/s/ Matthew G. Monforton</u>
                                 Matthew G. Monforton
                                 Attorney for Plaintiff

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO L. R. 7.1(d)(2)(E)</u>

I hereby certify that this document, excluding caption, tables and certificate of compliance, contains 6144 words, as determined by the word processing software used to prepare this document, specifically Microsoft Word.

DATED: January 19, 2023        Respectfully submitted,

<u>/s/ Matthew G. Monforton</u>
Matthew G. Monforton
Attorney for Plaintiff