Sarah Mazanec
Patricia Klanke
DRAKE LAW FIRM, P.C.
111 N. Last Chance Gulch, Ste 3J
Helena, MT  59601
Telephone: (406) 495-8080
sarah@drakemt.com
patricia@drakemt.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF MONTANA

## HELENA DIVISION

| | |
|---|---|
| DARIA DANLEY,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>CLAYTON CHRISTIAN, Commissioner of Higher Education, WADED CRUZADO, President of Montana State University, KYLEEN BRESLIN, Director of Montana State University's Office of Institutional Equity,<br><br>　　　　　　Defendants. | Cause No. CV-23-0004-SEH<br><br>**Defendants' Opposition to Plaintiff's Motion For Preliminary Injunction** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ..................................................................................... 1

FACTUAL BACKGROUND ...................................................................... 2

    Allegations against Danley ................................................................. 2

    Danley's removal from AGD ............................................................... 5

    Mutual No-Contact Order ................................................................... 5

    Formal Complaint ............................................................................... 6

    Communications with Breslin regarding the Mutual No-Contact Order ............. 10

CONTROLLING FEDERAL LAW .......................................................... 12

    I.  Preliminary Injunction Standard .................................................. 12

    II.  Title IX ...................................................................................... 13

DISCUSSION .......................................................................................... 16

    I.  Danley Is Not Likely To Succeed On The Merits Of Her Claim That The Mutual No-Contact Order Violated Her First And Fourteenth Amendment Rights ................................................................................................ 16

        a.  The No-Contact Order Does Not Apply to Participation in Organizations Not Officially Recognized by the University .................................................. 16

        b.  Even if the Mutual No-Contact Order prevented Danley from attending AGD activities, she has not shown that those activities are expressive. ........... 20

        c.  The Mutual No-Contact Order is not a prior restraint. ................................. 21

        d.  The Mutual No-Contact Order did not violate Danley's due process rights under the Fourteenth Amendment. ........................................................... 23

    II.  Danley Cannot Clearly Demonstrate a Likelihood of Irreparable Harm Because the Mutual No-Contact Order Does Not Prevent Danley From Participating in the AGD Events at Issue. ........................................................... 24

    III.  Danley Cannot Clearly Demonstrate a Likelihood of Irreparable Harm Because She Cannot Show an Urgent Need for Injunctive Relief. ...................... 26

    IV.  The Balance of Equities Tips in the University's Favor and The Mutual No-Contact Order Should Remain in Effect as to Contact Between Danley and ▮. .......................................................................................... 26

V. Continued Enforcement of MSU's Safety and Nondiscrimination Policies Is in the Public Interest ........................................................................27

CONCLUSION.........................................................................................29

CERTIFICATE OF COMPLIANCE......................................................29

CERTIFICATE OF SERVICE ...............................................................30

TABLE OF AUTHORITIES

**Cases**

*Akina v. Hawaii*, 835 F.3d 1003 (9th Cir. 2016) ............................................... 24, 25

*Alexander v. United States*, 509 U.S. 544, 113 S. Ct. 2766 (1993).........................21

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)...............13

*Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790 (9th Cir. 2011)........... 27, 28

*Arcara v. Cloud Books*, 478 U.S. 697, 106 S. Ct. 3172 (1986)...............................21

*Austin v. Univ. of Or.*, 925 F.3d 1139 (9th Cir. 2019)..............................................23

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)......................................................20

*Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 130 S. Ct. 2971 (2010).............28

*City of Dallas v. Stanglin*, 490 U.S. 19, 109 S. Ct. 1591 (1889)...................... 20, 21

*DeFunis v. Odegaard*, 416 U.S. 312, 94 S. Ct. 1704 (1974)...................................24

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073(9th Cir. 2014)............................13

*Gebser v. Lago Vista Indep. Sch. Dist.*,524 U.S. 274, 118 S. Ct. 1989 (1998).......15

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S. Ct. 562 (1988) ............28

*Hill v. Colorado*, 530 U.S. 703, 120 S. Ct. 2480 (2000) .................................. 22, 23

*In Def. of Animals v. United States Dep't of Int.*, 648 F.3d 1012
   (9th Cir. 2011)...........................................................................................................24

*Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093 (9th Cir. 2020)................27

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) .....................................................12

*Lydo Enters. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984).........................26

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374 (9th Cir. 1985)........26

*People in Interest of C.S.M.*, 570 P.2d 229 (Colo. 1977) ........................................22

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37,
   103 S. Ct. 948 (1983)...............................................................................................22

*Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh*, 229 F.3d 435
   (3d. Cir. 2000)...........................................................................................................20

*Roberts v. United States Jaycees*, 468 U.S. 609, 104 S. Ct. 3244 (1984) ..............28

*Rubin v. City of Santa Monica*, 308 F.3d 1008 (9th Cir. 2002)...............................24

*Schaefer v. Townsend*, 215 F.3d 1031 (9th Cir. 2000) ............................................24

*State of Tenn., et al. v. U.S. Dep't of Educ.*, No. 3:21-cv-308 (E.D. Tenn.) (July 15, 2022) ....................................................................................................13

*Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011) ..........................13

*Truth v. Kent Sch. Dist.*, 542 F.3d 634 (9th Cir. 2008)...........................................28

*Widmar v. Vincent*, 454 U.S. 263 (1981).................................................................22

*Winter v. Natural Resource Def. Council, Inc.*, 55 U.S. 7 (2008).................. passim

**Statutes**

2 U.S.C. § 2000d .......................................................................................................15

20 U.S.C. § 1681(a) ..................................................................................................13

**Regulations**

34 C.F.R. Part 106................................................................................. 14, 15, 17

85 Fed. Reg. 30,026 ..................................................................................................15

85 Fed. Reg. 30,447 ..................................................................................................15

85 Fed. Reg. 30,383 ..................................................................................................15

86 Fed. Reg. 32,637 ..................................................................................................13

**INTRODUCTION**

Montana State University (MSU) received reports from multiple sources that an Alpha Gamma Delta sorority member, Daria Danley, had referred to another member, ███████████████████████████████ said ████████ ████████████████████████ ██████████████████████ ████████████████████████, said ██████████ ██████████████, and ███████████████████████████ ████████████████████. In addition, ██████████████████ ███████████████████████████████████████ ████.

Under Title IX of the Education Amendments of 1972 and its implementing regulations, the University is required to take action to protect students when notified of such allegations, without waiting for investigative and disciplinary processes to conclude. In response to the allegations against Danley, the University instituted the "supportive measure" of a limited Mutual No-Contact Order. This Mutual No-Contact Order allows ████ and Danley equal access to education, enhances their safety, and helps prevent discrimination and retaliation. The order is content neutral and minimally burdens both ████ and Danley.

Plaintiff Danley has asked this Court to enjoin MSU from enforcing the Mutual No-Contact Order. Danley is not entitled to this relief because she cannot

1

show success on the merits. The Mutual No-Contact Order does not prevent

Danley from attending the events she claims it does. Danley waited over a year and

a half to file for a preliminary injunction, highlighting the fact that she will not

suffer irreparable harm if it is not granted. The balance of equities and public

interest weigh in favor of continuing the Mutual No-Contact Order, given MSU's

interest in protecting the rights of its students to pursue their education.

## FACTUAL BACKGROUND

**Allegations against Danley**

1.      Kyleen Breslin is the Managing Director/Title IX Coordinator of the Office

of Institutional Equity ("OIE") at Montana State University ("MSU"). Affidavit of

Kyleen Breslin, February 16, 2023, ¶ 1.

2.      On September 3, 2021, PJ Diamond, an MSU employee, contacted Breslin

to report concerns that ▮▮ may have been harassed ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ at ▮▮ sorority house, Alpha Gamma Delta ("AGD"). *Id.*,

¶ 2.

3.      Diamond told Breslin she had received reports from three different sorority

members that ▮▮ was being harassed and discriminated against by another

member who was in a position of leadership in the sorority. *Id.*, ¶ 3.

4.      Diamond provided Breslin with the name of one of the students who had

reported and two additional anonymous statements describing the authors'

concerns. *Id.*, ¶ 4.

5.       One of the statements stated that the author had witnessed "█████████

████████████████████████ The author said ████████████████████

████████████████████████████████████████████████████

████████████████ . *Id.*, Ex. 1.

6.      The author of the other letter alleged Danley was discriminating ██████████

█████████████████████. The author said Danley █████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ .

In addition, ██████████████████████████████████████████████

████████████████████ *Id.*, Ex. 2.

7.      On September 3, 2021, Breslin, based on this information, emailed ██ and

gave ██ information about the function of OIE and other potential resources. *Id.*, ¶

7, Ex. 3.

**Meeting with ██████**

8.      In response to Breslin's email, ██ contacted OIE, and on September 15,

2021, ██ met with Jennifer Wells, an OIE staff member. Breslin Affidavit, ¶ 9.

9.      During the meeting, ███ alleged that Danley had discriminated against ███
████████████████████████████████████████████████████████. *Id.*,
¶ 10.

10.     As to the alleged ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████ *Id.*, ¶ 11.

11.     In addition, ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████ *Id.*, ¶ 12.

12.     ████████████████████████████████████████
████████████████████████ *Id.*, ¶ 13.

13.     ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

4

███████████████████████████████████████████████████

████████████████████████████. *Id.*, ¶ 14.

14.    ████ reported feeling unsafe being in the sorority house because of Danley's behavior. *Id.*, ¶ 15.

**Danley's Removal from AGD**

15.    On September 4, 2021, the MSU AGD chapter sent Danley notice that the chapter was considering taking action against Danley regarding alleged comments "about our members in the LGBTQ+ Community." Dkt. 1, Ex. 1.

16.    On September 9, 2021, the MSU AGD chapter notified Danley that she was invited to attend the next Executive Council Meeting in which her membership status would be considered. Dkt. 1, Ex. 2.

17.    On September 16, 2021, Danley was notified that the Executive Council recommended her dismissal from AGD. Danley was prohibited from participating in AGD events, including attendance as a guest, and from living in the chapter house. Dkt. 1, Ex. 3.

18.    The University had no involvement in AGD's decision to dismiss Danley from the sorority. *Id.*, ¶ 16.

**Mutual No-Contact Order**

19.    Based on the allegations, Breslin determined it was necessary to put the supportive measure of a Mutual No-Contact Order in place. On September 20,

5

2021, Breslin sent Danley and ▮ each emails informing them that a Mutual No-Contact Order had been issued. The Order was attached. *Id.*, ¶ 17, Exs. 4-7.

20.     On September 20, 2021, staff met with ▮ to discuss the Mutual No-Contact Order. *Id.*, ¶ 22.

21.     On September 21, 2021, Breslin met with Danley and her attorney, Mathew Monforton, to discuss the Mutual No-Contact Order. *Id.*, ¶ 23, Ex. 8.

22.     The Mutual No-Contact Order prevented ▮ and Danley from making contact with each other. In addition, the order prevented Danley from accessing the AGD house or attending AGD events. The Mutual No-Contact order sent to Danley required her to contact OIE if "you believe ▮ has made contact with you or if you have made contact with ▮, even if it was an accident." *Id.*, Ex. 7.

23.     The Mutual No-Contact order sent to ▮ required ▮ to contact MSU "if you believe Daria Danley has made contact with you or if you have made contact with Daria Danley, even if it was an accident." *Id.*, Ex. 5.

**Formal Complaint**

24.     After meeting with staff, ▮ expressed the intent to file a formal complaint against Danley under the MSU Discrimination Harassment and Retaliation Policy. *Id.*, ¶ 25, Exs. 9-10.

25.     ▮ did not timely follow up to sign a formal complaint. *Id.*, ¶ 28.

6

26.     Based on the multiple reports and the severity of the allegations, ████

████████████████████████████████████████████████████████████████

████, Breslin determined it was necessary to sign the formal complaint to allow

the University to investigate the validity of the allegations and the risk of harm to

the community. *Id.*, ¶ 29.

27.     On October 22, 2021, Danley and Monforton were notified that a Formal

Complaint was filed by OIE naming Danley as a respondent. *Id.*, Exs. 11-12.

28.     The Formal Complaint notified Danley of the allegations against her, which

included allegations that she engaged in discriminatory behavior ████████

████████████████:

• ████████████████████████████████████████

████████████████████████████████████
████████████████████████████

████████████████████████████
████████████████████████████████

• ████████████████████████████████
██████████████████

████████████████████████████████
████████████████████



*Id.*, Ex. 12.

29.     Breslin assigned the investigation to an investigator under the applicable

MSU policy. *Id.*, ¶ 32.

30.     On November 17, 2021, the investigator interviewed Diamond. *Id.*, ¶ 33.

31.     Diamond reported that ██ had telephoned her and was distraught about how

Danley had been treating ██ . ████████████████████████

████████████████████████████████



▮▮▮▮▮▮▮▮▮. *Id.*, ¶ 34.

32.   On December 13, 2021, the investigator interviewed ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*,

¶ 35.

33.   On January 6, 2022, the investigator spoke to ▮ again, this time in the

context of the investigation. *Id.*, ¶ 36.

34.   On January 12, 2021, the investigator interviewed Danley with Monforton

present. Danley denied the allegations against her. *Id.*, ¶ 37.

35.   MSU attempted to continue its investigation by talking to witnesses

connected with AGD. However, AGD members were reluctant to participate in the

process because they believed it would be contrary to their pledge of

confidentiality as to the sorority's operations. *Id.*, ¶ 38.

36.   On January 21, 2022, staff asked Danley whether she wanted to engage in

the Informal Resolution process under the University's Discrimination Grievance

Procedures Accompanying the Discrimination, Harassment, and Retaliation Policy.

*Id.*, ¶ 39.

9

37.     Under the University's Informal Resolution Policy, examples of Informal Resolution include "mediation, facilitated conversation, and education." *Id.*, Ex. 10.

38.     Danley responded that she declined the request for Informal Resolution and requested that the office promptly dismiss the complaint. *Id.*, ¶ 40, Ex, 13.

39.     On February 3, 2022, Breslin notified Danley that the formal complaint had been dismissed. *Id.*, ¶ 42.

40.     The Notice of Dismissal stated:

As stated in MSU's Discrimination, Harassment, and Retaliation Policy:

"The Title IX Coordinator may dismiss a Formal Complaint at any time during the investigation or hearing" if "specific circumstances prevent the University from gathering evidence sufficient to reach a determination as to the Formal Complaint or allegations therein." Here, multiple potential witnesses declined to participate in the University investigation citing, in part, concerns that participation would conflict with the confidentiality conditions imposed upon them as members of Alpha Gamma Delta. Despite efforts to inform members of Alpha Gamma Delta of their rights and resources as MSU students, the University was prevented from gathering evidence sufficient to reach a determination.

*Id.*, Ex. 14.

**Communications with Breslin Regarding the Mutual No-Contact Order**

41.     On March 14, 2022, Danley contacted Breslin (with Monforton copied), and asked if the Mutual No-Contact Order was in place given that the Complaint was dismissed. Danley wondered if she could enter the AGD house and attend events with other members present. *Id.*, Ex. 15.

42.     On March 15, 2022, Breslin clarified that the Mutual No-Contact Order is a

supportive and protective measure independent of any complaint, and that it

prevented her from accessing the AGD house or attending AGD-hosted events. It

did not prevent her from participating in other events in which AGD members

were in attendance. Breslin clarified that if Danley saw ██ at an event she was

attending for an academic purpose, she could stay at the event but needed to avoid

communication with ██. She also invited Danley to contact her with any more

questions. Danley did not respond. *Id.*, ¶ 44, Ex. 15.

43.     On June 10, 2022, Danley contacted Breslin asking if the Mutual No-

Contact Order remained in place, believing that ██ had left MSU. Danley asked if

she could park in the AGD parking lot, claiming she had been granted permission

to use the parking lot by the building owners. *Id.*, ¶ 45, Ex. 16.

44.     In response, Breslin asked for more information about who had granted

Danley permission regarding accessing the property and parking lot. *Id.*

45.     Danley did not respond to Breslin's email. *Id.*

46.     On August 23, 2022, Danley contacted Breslin (with Monforton copied) and

asked the status of the Mutual No-Contact Order with ██. *Id.*, ¶ 45, Ex. 17.

47.     Breslin responded that the Mutual No-Contact Order remained in effect, but

asked Danley to provide context on why she wanted the Order lifted. Breslin also

told Danley to let her know if she had an educational need to interact with ██ or to

11

participate in functions related to the former AGD chapter, so that MSU could consider modifying the Order. *Id.*

48.     In addition, Breslin noted that the Mutual No-Contact Order was a supportive and protective measure and was a "non-punitive step aimed at creating a safe and equitable campus environment." She confirmed the Order was not part of any disciplinary record and does not indicate a finding of wrongdoing. *Id.*

49.     Danley did not respond to Breslin's email.

50.     Danley did not inform Breslin, prior to this litigation, that she had been reinstated as an alumna member of AGD or ask Breslin for clarification regarding whether she could attend alumnae chapter or national events or communicate with AGD members other than ▮. *Id.*

50.     Over five months later, on January 19, 2023, Danley filed this Complaint.

## CONTROLLING FEDERAL LAW

### I.    Preliminary Injunction Standard

Preliminary injunctions are extraordinary remedies that should not be granted unless the movant carries the burden of persuasion by a clear showing. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest.'" *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011)

(quoting *Winter v. Natural Resource Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008)).

The plaintiff must demonstrate all four elements, and "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "[S]erious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1085 (9th Cir. 2014).

## II.   Title IX

Title IX of the Education Amendments of 1972 provides that no person shall, on the basis of sex, be excluded from participation in, denied the benefits of, or subjected to discrimination under any education program or activity receiving federal financial assistance. 20 U.S.C. § 1681(a). Title IX's protections against sex discrimination encompass discrimination based on sexual orientation and gender identity. Enforcement of Title IX of the Education Amendments of 1972, 86 Fed. Reg. 32,637 (June 22, 2021)[1].

---

[1]The U.S. Department of Education has been preliminarily "enjoined and restrained from implementing" this document against states including Montana. *See State of Tenn., et al. v. U.S. Dep't of Educ.*, No. 3:21-cv-308 (E.D. Tenn.) (July 15, 2022). However, when the no-contact order was issued, this interpretation was the governing guidance.

Under Title IX implementing regulations, found at 34 C.F.R. Part 106, educational institutions must respond promptly to sexual harassment. Sexual harassment is defined as "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. § 106.30.

An education program or activity includes "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution." 34 C.F.R. § 106.44.

Title IX regulations also obligate an institution to reach out to "complainants" (defined as the person alleged to be the victim of conduct that could constitute sexual harassment) and offer "supportive measures," even if a formal complaint is never filed triggering the grievance process. 34 C.F.R. § 106.44. 1.; 34 C.F.R. § 106.30(a). "Supportive measures" are defined as "non-disciplinary, non-punitive individualized services" which are "designed to restore or preserve equal access to the recipient's education program or activity without

14

unreasonably burdening the other party." 34 C.F.R. § 106.30. [2] Supportive

measures may include, *inter alia*, mutual restrictions on contact between the

parties, changes in work or housing locations, "and other similar measures." 34

C.F.R. § 106.30. The supportive measures contemplated by regulation are thus

non-exclusive and flexible.

Recipients can offer "supportive measures" regardless of the outcome of a

case, even after a determination of non-responsibility on the part of the respondent

or if the recipient cannot gather sufficient evidence to reach a determination.

Nondiscrimination on the Basis of Sex in Education, 85 Fed. Reg. 30,026, 30,447,

30,383 (May 19, 2020).

Other federal laws also obligate the University to respond to allegations of

discrimination and harassment that fall outside of sexual discrimination. Title VII

also applies to institutions, and is "parallel to Title IX"; it prohibits discrimination

on the basis of race, color, or national origin. 2 U.S.C. § 2000d et seq; *Gebser v.*

*Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S. Ct. 1989 (1998).

//

---

[2] When the Department of Education released the updated Title IX regulations, the Department of Education noted that it changed "interim" measure into "supportive measure" to "clarify that supportive measures must be offered not only in an 'interim' period during an investigation, but regardless of whether an investigation is pending or ever occurs." *See* Nondiscrimination, 85 Fed. Reg. at 30,046, 30,044 n.168.

**DISCUSSION**

**I.    Danley Is Not Likely to Succeed on the Merits of Her Claim that the Mutual No-Contact Order Violated Her First And Fourteenth Amendment Rights.**

Danley cannot demonstrate a likelihood of success on the merits of her claim that the Mutual No-Contact Order violated her right of expressive association under the First Amendment, because the Mutual No-Contact Order does not actually restrain Danley from any expression or association with AGD. Danley has not shown that any of the activities she wishes to attend, such as rodeo or basketball events, are expressive in nature and thereby entitled to protection. The Mutual No-Contact Order does not constitute a prior restraint because it addresses conduct, not expression.

Danley is also not likely to succeed on the merits of her claim that the Mutual No-Contact Order violated her Fourteenth Amendment rights, because the Order is a non-punitive measure specifically authorized by federal law to be instituted independent of any investigative or disciplinary proceedings. MSU has repeatedly invited Danley to participate in dialogue to ensure that the Mutual No-Contact Order does not constitute an unreasonable burden.

**a.    The No-Contact Order Does Not Apply to Participation in Organizations Not Officially Recognized by the University.**

MSU's nondiscrimination policy, mirroring federal regulations, defines its jurisdiction to include "locations, events, or circumstances over which the

16

University exercised substantial control over both the Respondent and the context in which the Prohibited Conduct is alleged to have occurred, and also includes any buildings owned or controlled by a student organization that is officially recognized by the University." Breslin Aff., Ex. 9; 34 C.F.R. § 106.44. MSU's policy applies generally to "employees, students, affiliates, and visitors . . . while engaged in activities directly related to the nature of their University affiliation." Breslin Aff., Ex. 9.

MSU's policy states that MSU will provide "Supportive and Protective Measures," which it defines, again consistent with federal regulations, as "non-disciplinary, non-punitive individualized services." Breslin Aff., Ex. 9; 34 C.F.R. § 106.30. These are "designed to restore or preserve equal access to the University's Programs and Activities without unreasonably burdening the other party and include[] measures designed to protect the safety of all parties or the University's campus environment or prevent or deter potential Prohibited Conduct." Breslin Aff., Ex. 9. Such measures may include changes in work or housing locations, mutual restrictions on contact, and other similar measures. As in the federal regulation, the list of potential measures is non-exclusive, and administrators are authorized to adopt "similar measures" meeting the stated objectives.

When the Mutual No-Contact Order in this case was issued, the MSU chapter of AGD was an officially recognized student organization. The sorority

17

house and activities were properly within MSU's Title IX jurisdiction. MSU was not only authorized but required by federal regulations to offer supportive measures in response to allegations of discriminatory harassment occurring within the sorority. These measures could include mutual restrictions on contact between the parties, changes to housing locations, and similar measures (such as restricting access to the AGD sorority house).

Supportive measures are defined by both federal regulation and MSU policy as individualized services designed to restore access to University programs without unreasonably burdening the other party. MSU had received multiple reports from various sources that ▮ was denied access to AGD, a University-sponsored program, because of an alleged pattern of discriminatory harassment by Danley. MSU acted reasonably to restore ▮ access to participation in AGD through the Mutual No-Contact Order. The restriction did not unreasonably burden Danley under the circumstances. In fact, it did not burden her at all because AGD had voted to remove her as a member four days before the Mutual No-Contact Order was issued. The terms of the dismissal stated that Danley was not permitted to live at the sorority house. In addition, Danley was prohibited from attending or participating in any AGD events, even as a guest. Given AGD's decision to remove Danley from the collegiate chapter, the Mutual No-Contact Order did not

18

prevent Danley from participation in AGD's collegiate chapter, and thus did not intrude upon her rights of expressive association.

The collegiate chapter of AGD at MSU has since dissolved. AGD no longer exists as a recognized student association. Danley asserts that her membership has since been reinstated in AGD's parent organization or an affiliated alumnae chapter. Because there is no longer a collegiate chapter officially recognized by MSU, any activity of AGD is not an "education program or activity" over which MSU exercises substantial control. Danley's participation in events not directly associated with MSU, including events sponsored by AGD's alumnae chapter or parent organization, is not, and never has been, restrained by the Mutual No-Contact Order.

The Mutual No-Contact Order does not prevent Danley from adopting and espousing the values, pledge, and motto of AGD. It has not restrained Danley from contacting AGD and having her membership reinstated as an alumna. Nor is AGD prevented from organizing any of its expressive activities. Absent an active collegiate chapter officially recognized by MSU, MSU has no ability, legally or practically, to control any aspect of AGD activities.

//

**b. Even if the Mutual No-Contact Order prevented Danley from attending AGD activities, she has not shown that those activities are expressive.**

The fact that AGD seeks to promote certain values does not make all of its activities expressive, and does not mean that any restraint on those activities rises to the level of a constitutional violation. Not every "kernel of expression" is sufficient to bring an activity within the protection of the First Amendment. *Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh*, 229 F.3d 435, 444 (3d. Cir. 2000) (quoting *City of Dallas v. Stanglin*, 490 U.S. 19, 109 S. Ct. 1591 (1989)). In *Pi Lambda Phi*, members of a fraternity failed to sustain the assertion that they engaged in expressive association. Although the fraternity's international organization promoted certain ideals and engaged in "various programs aimed at individual development," there was "no evidence in the record that even a single member of the University chapter participated in any of these programs." *Pi Lambda Phi*, 229 F.3d at 444.  The Third Circuit rejected the premise that the fraternity chapter was an expressive association just because it claimed to be one. *Id.*

Similarly, Danley claims that AGD is an expressive association, but does not identify any expressive activities in which she has participated or intends to participate. She asserts that she fears the Mutual No-Contact Order will prevent her from attending spring events "tied to MSU Bobcat basketball and rodeo events as

20

well as graduation-related events." There is no evidence of any expressive character of these events. Attending a basketball game or rodeo is instead more akin to "mingling at a dance hall," "walking down the street," or "meeting one's friends at a shopping mall," which are not protected expressive activities. *Stanglin*, 490 U.S. at 25. An association must engage in some expressive activity that could be impaired in order to be entitled to protection. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655, 120 S. Ct. 2446 (2000). Danley has not identified any expressive activity by either Danley or AGD that has been or will be impaired by the existence of the Mutual No-Contact Order. Danley is therefore unlikely to succeed on the merits, and is not entitled to a preliminary injunction. *Winter*, 555 U.S. at 20.

### c. The Mutual No-Contact Order is not a prior restraint.

Danley cannot show a likelihood of success on the merits of her argument that the Mutual No-Contact Order constitutes a prior restraint. The Mutual No-Contact Order does not in fact restrain her from association with AGD. An order that does not actually prevent the plaintiff from engaging in speech is by definition not a prior restraint. *See, e.g., Alexander v. United States*, 509 U.S. 544, 549-50, 113 S. Ct. 2766 (1993) (RICO forfeiture not prior restraint because plaintiff could have continued adult entertainment business with assets not subject to forfeiture); *Arcara v. Cloud Books*, 478 U.S. 697, 106 S. Ct. 3172 (1986) (general nuisance

21

ordinance forcing bookstore closure not prior restraint because store could have reopened elsewhere).

The Mutual No-Contact Order restrains Danley only from contact with ■ (and likewise restrains ■ from contact with Danley). The First Amendment "does not compel one to submit to unwanted or detrimental association with another." *People in Interest of C.S.M.*, 570 P.2d 229, 231 (Colo. 1977); *see also Hill v. Colorado*, 530 U.S. 703, 716-17, 120 S. Ct. 2480 (2000) (recognizing "right to be let alone."). In this case, ■ and Danley have each expressed that they find contact with the other harmful and unwanted.

A public university may regulate speech within its jurisdiction so as to reserve the forum of the university for its intended purposes. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46, 103 S. Ct. 948 (1983). It may also impose reasonable time, place, and manner restrictions that are content neutral. *Widmar v. Vincent*, 454 U.S. 263, 269-70 (1981). Restrictions that apply equally to all, regardless of viewpoint, and make no reference to the content of speech, are content neutral. *Hill*, 530 U.S. at 719-20. The restriction here is content neutral because it addresses student conduct rather than the content of any communications. *See Hill*, 530 U.S. at 731-32. "Concern about employing the power of the State to suppress discussion of a subject or point of view is not . . . raised in the same way when a law addresses not the content of speech but the

circumstances of its delivery." *Hill v. Colorado*, 530 U.S. 703, 735, 120 S. Ct. 2480 (2000) (Souter, J., concurring). MSU has not restrained Danley from delivering any viewpoint or message, and has addressed only the circumstances of speech by both Danley and ▮ without regard to its content.

### d.  The Mutual No-Contact Order did not violate Danley's due process rights under the Fourteenth Amendment.

The Mutual No-Contact Order did not violate Danley's right to due process under the Fourteenth Amendment. A procedural due process claim requires a plaintiff to identify a liberty or property interest protected by the Constitution. *Austin v. Univ. of Or.*, 925 F.3d 1139, 1140 (9th Cir. 2019). As set forth above, Danley has not identified any protected interest actually infringed by the Mutual No-Contact Order.

Further, federal regulations specifically permit—in fact, mandate—the process used by MSU. Upon receipt of a complaint alleging harassment or discrimination, the University must offer supportive measures to a complainant, including mutual restrictions on contact. These measures may remain in place regardless of whether a formal complaint is ever filed and regardless of the outcome of any investigation. Supportive measures are designed to exist apart from the disciplinary process. This is not a function of MSU policy or of MSU's enforcement in this case, but an express provision of federal regulations.

Danley's has not identified deprivation of a protected liberty interest, and therefore has failed to state a claim for a due process violation.

## II. Danley Cannot Clearly Demonstrate a Likelihood of Irreparable Harm Because the Mutual No-Contact Order Does Not Prevent Danley From Participating in the AGD Events at Issue.

Generally, a case is rendered moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1013 (9th Cir. 2002) (quoting *Schaefer v. Townsend*, 215 F.3d 1031, 1033 (9th Cir. 2000)). Federal courts are precluded from deciding questions that cannot affect the rights of the litigants in the case before them. *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S. Ct. 1704 (1974).

A request for a preliminary injunction is moot where a court can no longer grant the effective relief sought in the request. *Akina v. Hawaii*, 835 F.3d 1003, 1010 (9th Cir. 2016). This may be the case where the event or activity sought to be restrained has either already happened, or has been cancelled without reasonable basis to believe it will resume. *Akina*, 835 F.3d at 1010; *In Def. of Animals v. United States Dep't of Int.*, 648 F.3d 1012, 1013 (9th Cir. 2011).

In *Akina*, the plaintiffs sought a preliminary injunction to prevent the defendants from holding "racially-exclusive elections for Native Hawaiians." *Akina*, 835 F.3d at 1010. The preliminary injunction was denied, and by the time the matter reached the Ninth Circuit on interlocutory appeal, the election had been

cancelled, no other elections were scheduled, and the entity organizing the election had been dissolved. *Id.* "Given those changed circumstances," the Court concluded that it "[could] not provide any effective relief sought in the preliminary injunction request." *Id.* The Court's opinion under such circumstances "would amount to an impermissible advisory opinion that would, at most, guide any future [election] efforts." *Id.* at 1011.

In this case, the provisions of the Mutual No-Contact Order do not apply to Danley's association with AGD's parent organization or alumnae chapter, as these are beyond the scope of MSU's jurisdiction. The circumstances under which the Mutual No-Contact Order could have been enforced as to Danley's association with AGD no longer exist. MSU could have enforced the order only as to activities of a recognized student organization, and that student organization has been dissolved. The only organization now existing is not a recognized student organization, so MSU has no authority over its activities.

The issuance of an order preventing MSU from enforcing the Mutual No-Contact Order as to Danley's association with AGD would not affect the rights of the parties, and would serve only as an advisory opinion guiding the hypothetical circumstance in which a new collegiate chapter of AGD is recognized. There is no evidence of efforts toward reorganization of the collegiate chapter. In light of the

changed circumstances, the Court cannot provide effective relief by way of preliminary injunction.

### III. Danley Cannot Clearly Demonstrate a Likelihood of Irreparable Harm Because She Cannot Show an Urgent Need for Injunctive Relief.

"A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights[,] a plaintiff demonstrates the lack of need for speedy action." *Lydo Enters. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984). A long delay "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

In this case, the Mutual No-Contact Order was issued September 20, 2021. Danley retained legal counsel the next day, but waited 16 months to seek a preliminary injunction. The delay of well over a year indicates that there is little urgency warranting issuance of a preliminary injunction, and that she will not suffer irreparable harm if the preliminary injunction is not granted. *Winter*, 555 U.S. at 20.

### IV. The Balance of Equities Tips in the University's Favor and The Mutual No-Contact Order Should Remain in Effect as to Contact Between Danley and ▮.

The Mutual No-Contact Order precludes contact between Danley and a student she alleges harassed and stalked her. The Mutual No-Contact Order

protects Danley from this alleged harassment, and is therefore in her interests as well. The burden to leave a location if the other party is present does not fall solely upon Danley, but on either party. The restriction does not unreasonably burden either party because, as Breslin has explained to Danley, if there is an educational need for both students to attend an event, they may do so, provided that they are conscious of avoiding direct contact and communication. Danley has never identified any need to interact with ▉. The balance of equities favors enforcement of this protective measure for both students. *Winter*, 555 U.S. at 20.

## V. Continued Enforcement of MSU's Safety and Nondiscrimination Policies Is in the Public Interest.

The State has a compelling interest in preventing contact between ▉ and Danley, each of whom alleges harassment by the other. Federal law requires MSU to offer supportive measures where harassment is alleged. Failure to do so may constitute deliberate indifference for which the University may be held liable in damages. *See, e.g.*, *Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020).

The State also has an interest in its nondiscrimination policy. A university-sponsored student organization is a limited public forum, over which the University may impose restrictions that are reasonable in light of the purpose of the forum and viewpoint neutral. *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 798 (9th Cir. 2011). "[P]art of a school's mission is to instill in students the

27

'shared values of a civilized social order, which includes instilling the value of nondiscrimination." *Truth v. Kent Sch. Dist.*, 542 F.3d 634, 649 (9th Cir. 2008) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272, 108 S. Ct. 562 (1988)). A restriction that serves purposes unrelated to the content of expression, and only incidentally burdens some speakers, messages, or viewpoints, is deemed neutral. *Alpha Delta Chi*, 648 F.3d at 800 (citing *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 695-96, 130 S. Ct. 2971 (2010)). Antidiscrimination laws intended to ensure equal access to the benefits of society serve goals 'unrelated to the suppression of expression' and are neutral as to both content and viewpoint. *Alpha Delta Chi*, 648 F.3d at 801 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 623-24, 104 S. Ct. 3244 (1984)).

The public interest favors allowing MSU to enforce the limited supportive measures it put in place in this case: a Mutual No-Contact Order, which only prohibits contact between ■ and Danley on University property or in University-affiliated events, and allows exceptions for legitimate educational need. These supportive measures are based on MSU's antidiscrimination policies, which mirror federal law, and are for the purpose of protecting each student's right to pursue educational opportunities, protecting the safety of all parties, and deterring discrimination.

28

Issuance of a preliminary injunction in this matter would restrain MSU from enforcing policies intended to promote student safety and nondiscrimination. The requested injunction is not in the public interest. *Winter*, 555 U.S. at 20.

## CONCLUSION

Defendants request that this Court deny Plaintiff Danley's motion for a preliminary injunction to enjoin the September 2021 Mutual No-Contact Order. Danley cannot meet any of the elements required to entitle her to the issuance of such an extraordinary remedy.

Dated: February 16, 2023                                  /s/ Sarah Mazanec
                                                          Sarah Mazanec

## CERTIFICATE OF COMPLIANCE

I hereby certify that this **Defendants' Opposition to Plaintiff's Motion For Preliminary Injunction** excluding caption, certificates of service, and compliance, contains 6,491 words, as determined by the word processing software used to prepare this document, specifically Word.

Dated February 16, 2023

                                                          /s/ Sarah Mazanec
                                                          Sarah Mazanec

## CERTIFICATE OF SERVICE

I certify that February 16, 2023, a true and correct copy of the foregoing **Defendants' Opposition to Plaintiff's Motion For Preliminary Injunction** was served upon the following as indicated:

| | |
|---|---|
| Matthew G. Monforton<br>Monforton Law Offices, PLLC<br>32 Kelly Court<br>Bozeman, Montana 59718<br>Telephone: (406) 570-2949<br>E-mail:<br>matthewmonforton@yahoo.com | [ X ] U.S. Mail<br>[   ] Hand-Delivery<br>[ X ] Email: |

/s/ Sarah Mazanec
Sarah Mazanec